# Staunton

## ROBERT EDWARDS AND WILLIE SAVAGE, JR. v. COMMONWEALTH OF VIRGINIA.

September 6, 1950.

Record No. 3712.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Israel Steingold, Samuel A. Steingold* and *Maurice Stein-gold,* for the plaintiffs in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Warrants were issued against the defendants, Edwards and Savage, construed as charging them with picketing in violation of an act of the General Assembly approved March 25, 1946, Acts of Assembly, 1946, ch. 229, p. 391;* sec. 4711a, 1946 Cum. Supp. to Code, 1942 (Michie); sec. 40-64, Code, 1950.

On their trial in the corporation court they were convicted and fined $25 each. On this writ of error they assert (1) that the said statute violates the First and Fourteenth Amendments of the Constitution of the United States, and (2) that even if the statute is constitutional the evidence fails to show that they violated it. We deal first with the second assignment.

The defendants introduced no evidence but relied on their motion to strike the Commonwealth's evidence, which the trial court certified to be as follows:

Gem theatre, in Norfolk, is located at the intersection of Church street and Olney road, and fronts on Church street about 20 feet. The sidewalk in front of the theatre

*Be it enacted by the General Assembly of Virginia:

Section 1. It shall be unlawful for any person singly or in concert with others to interfere or attempt to interfere with another in the exercise of his right to work or to enter upon the performance of any lawful vocation, by the use of force, threats of violence or intimidation, or by the use of insulting or threatening language directed toward such person, to induce or attempt to induce him to quit his employment or refrain from seeking employment.

Section 2. It shall be unlawful for any person to engage in picketing by force or violence, or to picket alone or in concert with others in such manner as to obstruct or interfere with free ingress or egress to and from any premises, or to obstruct or interfere with free use of public streets, sidewalks or other public ways.

Section 3. It shall be unlawful for any person who is not, or immediately prior to the time of the commencement of any strike was not, a bona fide employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such strike or such business or industry.

Section 4. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and punished accordingly.

Section 5. If any part of this act shall be held to be invalid, the remainder thereof shall not be affected, but remain in full force and effect.

is approximately six feet wide. When arrested the defendants were patrolling in front of the theatre, one walking in one direction, the other in the opposite direction, at a distance from one to two feet from the building line. Each defendant carried a placard 28 inches by 22½ inches, bearing this inscription:

"Jobs are slow because of Jim Crow
Demand
Negro Manager at Gem's Jim Crow Show
Committee Against Job Discrimination"

The picketing did not interfere with the free use of the sidewalk by pedestrians; the entrances and exits of the theatre were free for ingress and egress, but the back-and-forth movements of the defendants did affect people going in and out of the theatre. Defendants said to the prospective patrons, "Don't go in there. This theatre is Jim Crow. Stand up for your rights." One witness testified that they told the people not to go into the theatre because they did not have a colored manager. Some of the prospective patrons went on into the theatre but some did not go in. The box office receipts dropped "appreciably" after the picketing began.

The employees of the theatre were not on strike. There was no act of violence and no threat of violence by defendants or any one else. The defendants were not employees of the theatre and had never been employed in that theatre or in the moving picture industry.

The order of conviction merely found the defendants guilty as charged in the warrants, without specifying the section of the act they were found to have violated. Very clearly the evidence does not show any violation of sections 1 or 2. This much is in effect conceded, but the Commonwealth argues that section 3 applies to and forbids the acts done by the defendants, while the defendants assert that the section applies only to picketing while a strike is in progress.

The first section of the act forbids interference by any-

body with another's right to work, by the use of violence, threats or insults.

The second section forbids picketing by force or violence, or in such manner as to interfere with free ingress or egress to and from any premises, or with the free use of public ways.

The third section forbids picketing by non-employees. It applies to persons who are non-employees at the time of the picketing, and also to persons who were non-employees at the beginning of any strike. It prohibits any person who was not an employee of the business or industry being picketed immediately prior to the commencement of any strike, from picketing with respect to such strike. It also prohibits any person who is not an employee of the business or industry being picketed from picketing with respect to such business or industry. In other words, this section as written declares it unlawful:

(1) For any person who is not a *bona fide* employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such business or industry; and

(2) For any person who was not, immediately prior to the time of the commencement of any strike, a *bona fide* employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such strike.

We could, of course, add to or rearrange the words of the statute and make its third section apply only when there is a strike; but our function is to interpret the act as written, not to rewrite it. *Virginia Ass'n of Ins. Agents* v. *Commonwealth*, 187 Va. 574, 578, 47 S. E. (2d) 401, 404; *Lewis* v. *Commonwealth*, 184 Va. 69, 73, 34 S. E. (2d) 389, 390.

So construed, it is clear that the first-named provision of section 3 applies to the defendants under the undisputed facts of this case and makes unlawful the acts and conduct for which they were arrested and convicted.

This conclusion presents for decision the contention of the defendants that the part of the act which makes criminal what they were doing is an illegal restraint upon their right to freedom of speech, guaranteed to them by the Fourteenth Amendment of the Constitution, and is, therefore, invalid. That question is to be determined by reference to the decisions of the Supreme Court of the United States, which has the final say.

In *Thornhill* v. *Alabama*, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093, Thornhill was convicted of a misdemeanor for violating an Alabama statute forbidding any person to loiter about another's premises or place of business for the purpose of influencing others not to have business dealings there, or to picket a place of business for the purpose of interfering with or injuring any lawful business or enterprise there conducted. The court held that the statute was invalid on its face because it violated the freedom of speech secured by the First Amendment against Federal abridgment and by the Fourteenth Amendment against abridgment by the States.

Among other things the court said that particularly where the principle of free discussion is concerned, it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct, and that the statute as applied by the State court left no room for exceptions based on the number of persons engaged in picketing, its peaceful character, the nature of the dispute, or the truthfulness of the things asserted. "In sum, whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise, all such activity without exception is within the inclusive prohibition of the statute so long as it occurs in the vicinity of the scene of the dispute." 310 U. S. at p. 101, 60 S. Ct. at p. 744.

Answering the argument of the State that the purpose of the statute was to prevent violence and breaches of the peace, which it said were the concomitants of picketing, the

court said: "The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter." 310 U. S. at p. 105, 60 S. Ct. at pp. 745-6.

In *Carlson* v. *California*, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104, decided the same day as the *Thornhill Case*, the court held invalid an ordinance of a California county similar to the Alabama statute, on the ground that for the reasons stated in the *Thornhill Case*, publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, word of mouth, or banner, was within the liberty of communication secured by the Fourteenth Amendment against State abridgment. "But the ordinance in question here abridges liberty of discussion under circumstances presenting no clear and present danger of substantive evils within the allowable area of State control." 310 U. S. at p. 113, 60 S. Ct. at p. 749.

Since those cases the constitutional limitations upon the power and duty of the States to preserve the peace and to protect the privacy, the lives and the property of their residents, have been further defined in a variety of circumstances.

In *Milk Wagon Drivers Union, etc.* v. *Meadowmoor Dairies*, 312 U. S. 287, 61 S. Ct. 552, 85 L. ed. 836, 132 A. L. R. 1200, raising questions affecting the scope of the *Thornhill* and *Carlson Cases*, the court upheld an Illinois injunction against acts of picketing, in themselves peaceful but "enmeshed with contemporaneously violent conduct which is concededly outlawed." 312 U. S. at p. 292, 61 S. Ct. at p. 554. The court said that such a decree of injunction to prevent continuance and recurrence of flagrant vio-

lence "arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of a general law." 312 U. S. at pp. 292-3, 61 S. Ct. at pp. 554-5.

The court expressly did not qualify the Thornhill and Carlson decisions but reaffirmed them, saying they "involved statutes baldly forbidding all picketing near an employer's place of business. Entanglement with violence was expressly out of those cases. The statutes had to be dealt with on their face, and therefore we struck them down," as an unlimited ban on free communication. 312 U. S. at p. 297, 61 S. Ct. at pp. 556-7.

In *American Federation of Labor* v. *Swing*, 312 U. S. 321, 61 S. Ct. 568, 85 L. ed. 855, Swing's beauty shop was picketed in an effort to unionize it. An injunction was granted by decree which, on its face, as the court found, "rested on the explicit avowal that 'peaceful persuasion' was forbidden in this case because those who were enjoined were not in Swing's employ." Said the court:

"We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him." 312 U. S. at p. 325, 61 S. Ct. at p. 570.

It was again held that such a ban of free communication is inconsistent with the guarantee of freedom of speech; that while a State has ample power to regulate local problems thrown up by modern industry and to preserve the peace, yet those essential powers are not unfettered by the requirements of the Bill of Rights, and "a State cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic

competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace." 312 U. S. at p. 326, 61 S. Ct. at p. 570.

In *Carpenters & Joiners Union, etc.* v. *Ritter's Cafe,* 315 U. S. 722, 62 S. Ct. 807, 86 L. ed. 1143, Ritter's cafe was picketed by members of a union because a contractor employed by Ritter to construct a building a mile and a half away from the restaurant employed nonunion labor. The Texas court enjoined this picketing on the ground that it constituted a violation of the State's anti-trust law. The Supreme Court, four Justices dissenting, affirmed, saying: "The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted." 315 U. S. at p. 725, 62 S. Ct. at p. 809.

"While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals, and general welfare of its people * * *. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' " (Quoting from Mr. Chief Justice Hughes in *Near* v. *Minnesota,* 283 U. S. 697, 708, 51 S. Ct. 625, 628, 75 L. ed. 1357). 315 U. S. at p. 726, 62 S. Ct. at p. 809.

The court said further that "recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute;" and that denial to the States of power to draw this line would compel the States to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose. 315 U. S. at pp. 727-8, 62 S. Ct. at p. 810.

The court distinguished the case from *Bakery & Pastry Drivers, etc.* v. *Wohl*, 315 U. S. 769, 62 S. Ct. 816, 86 L. ed. 1178, decided the same day, on the ground that the business of the retailers allowed to be picketed in the *Wohl Case* was directly involved in the dispute. The court said in the *Wohl Case* that "one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive;" (315 U. S. at p. 774, 62 S. Ct. at p. 818); and that the record did not indicate that the picketing was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; or that there was an actual or threatened abuse of the right to free speech through the use of excessive picketing. The court added: "A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual." 315 U. S. at p. 775, 62 S. Ct. at p. 819.

In *Cafeteria Employees Union, etc.* v. *Angelos*, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58, a labor union picketed a cafeteria in an attempt to organize it. The cafeteria was operated by the owners without any employees. The picketing was carried on by one person at a time parading in front of the premises carrying signs tending to give the impression that the owners were unfair to organized labor. The State courts enjoined the union in broad terms from picketing at or near respondents' place of business. The Supreme Court by unanimous decision reversed, saying that the doctrine stated in *Senn* v. *Tile Layers Union*, 301 U. S. 468, 57 S. Ct. 857, 81 L. ed. 1229, had been applied in later cases, "by enforcing the right of workers to state their case and to appeal for public support in an orderly and peaceful manner regardless of the area of immunity as defined by state policy." 320 U. S. at p. 295, 64 S. Ct. at p. 127.

In *Giboney* v. *Empire Storage, etc., Co.*, 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834, a State court injunction was

upheld, again by a unanimous court, prohibiting peaceful picketing carried on in an effort to compel Empire to agree to stop selling ice to non-union peddlers, although such an agreement would have violated a Missouri criminal statute. The court distinguished the *Thornhill* and *Carlson Cases, supra,* saying that "in both these cases this Court struck down statutes which banned all dissemination of information by people adjacent to certain premises, pointing out that the statutes were so broad that they could not only be utilized to punish conduct plainly illegal but could also be applied to ban all truthful publications of the facts of a labor controversy;" and that in the *Thornhill Case* "the Court was careful to point out that it was within the province of states 'to set the limits of permissible contest open to industrial combatants.' " 336 U. S. at pp. 498-9, 69 S. Ct. at p. 689.

The court also distinguished the *Ritter's Cafe* and *Wohl Cases, supra,* adding: "No opinions relied on by petitioners assert a constitutional right in picketers to take advantage of speech or press to violate valid laws designed to protect important interests of society." 336 U. S. at p. 501, 69 S. Ct. at p. 690.

Three cases dealing with picketing were decided by the Supreme Court on May 8, 1950: *International Brotherhood of Teamsters, etc.* v. *Hanke* (and another case heard with it), 339 U. S. 470, 70 S. Ct. 773; *Building Service Employees International Union* v. *Gazzam,* 339 U. S. 532, 70 S. Ct. 784; *Hughes* v. *Superior Court,* 339 U. S. 460, 70 S. Ct. 718.

In the *Hanke Case* it was held that the Fourteenth Amendment does not bar a state from use of the injunction to prohibit the picketing of a business conducted by the owner himself, without employees, in order to compel him to convert to union shop. This on the ground that the court would not interfere with the State's judgment in striking a balance between competing social-economic interests, and in deciding that it was more important to safeguard the values it placed upon self-employers than to prohibit the restriction entailed upon communication, which the

unions sought to convey through picketing. The court there said that while picketing has an ingredient.of communication, "it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is 'indeed a hybrid.' * * * The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and 'the power of the State to set the limits of permissible contest open to industrial combatants.'" 339 U. S. 470, 70 S. Ct. at pp. 775-6.

While a State's judgment, it is said, on striking such a balance, is subject to the limitations of the Fourteenth Amendment, yet because it embraces a State's social and economic policies, it "comes to this Court bearing a weighty title of respect." The court stated that what was actually decided in the *Swing, Wohl* and *Angelos Cases, supra,* did not preclude the upholding of the State of Washington's power to make the choice of policy in question. "In those cases we held only that a State could not proscribe picketing merely by setting artificial bounds, unreal in the light of modern circumstances, to what constitutes an industrial relationship or a labor dispute." 339 U. S. 470, 70 S. Ct. at p. 778.

In the *Gazzam Case* a State injunction against peaceful picketing was upheld because the picketing was for the unlawful objective of having the employer coerce his employees' selection of a bargaining representative.

The *Hughes Case* answered yes to the question whether a State could enjoin peaceful picketing of a place of business solely to compel the hiring of Negroes in proportion to its Negro customers. The court said that the Due Process Clause did not preclude California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy, and that to deny it that right would mean that there could be no prohibition of such picketing to secure proportional employment of Hungarians in Cleveland, of Poles

in Buffalo, of Germans in Milwaukee, and so on through the whole gamut of racial and religious concentrations in various cities. "States may well believe that such constitutional sheltering would inevitably encourage use of picketing to compel employment on the basis of racial discrimination. In disallowing such picketing States may act under the belief that otherwise community tensions and conflicts would be exacerbated. * * * The Constitution does not demand that the element of communication in picketing prevail over the mischief furthered by its use in these situations." 339 U. S. 460, 70 S. Ct. at p. 721.

The court further stated that because of its element of communication picketing under some circumstances finds sanction in the Fourteenth Amendment, citing the *Thornhill, Swing, Wohl* and *Angelos Cases, supra,* and added:

"However general or loose the language of opinions, the specific situations have controlled decision. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * Picketing when not in numbers that of themselves carry a threat of violence may be a lawful means to a lawful end." 339 U. S. 460, 70 S. Ct. at pp. 721-2.

We have thus reviewed at length the apposite decisions of the Supreme Court in order to discern the pattern of its holdings in its effort "to strike a balance" between the constitutional provision of free speech and the power of the State, through its courts or through its legislature, to promote the health, morals, safety and general welfare of its people. While the subsequent decisions have somewhat extended the limits of permissible State action beyond those indicated by the *Thornhill* and *Carlson Cases,* those cases have not been departed from in their holding that a statute so broadly drawn as to prohibit picketing for a lawful purpose, unaccompanied by the threat or the fact of force, and

limited to truthful publication of the facts of a dispute, is invalid.

The pattern which emerges to shape the boundaries of State action seems to be that picketing is subject to regulation by the State, either by legislation or by court action. But such regulation must have a reasonable basis in prevention of disorder, restraint of coercion, protection of life or property, or promotion of the general welfare. The instrument of State action, whether judicial process or legislative enactment, must be specifically directed to acts or conduct which overstep legal limits, and not include those which keep within the protected area of free speech.

If we assume, upon the rather inconclusive evidence shown in the record, that the picketing for which the defendants in the case in judgment were convicted was for an unlawful purpose, *i. e.*, for the purpose of compelling the theatre to hire a colored manager, without regard to any other qualification, and therefore properly subject to ban under the holding in the *Hughes Case*, that alone does not establish the validity of that part of section 3 of the act with which we are dealing, and which, as we construe it, makes it unlawful for any person not a *bona fide* employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such business or industry.

We have said more than once that the test of the constitutional validity of a law is not what has been done under it, but what may by its authority be done. *Violett v. Alexandria*, 92 Va. 561, 574, 23 S. E. 909, 913, 53 Am. St. Rep. 825, 31 L. R. A. 382; *Southern Ry. Co.* v. *Commonwealth*, 107 Va. 771, 777, 60 S. E. 70, 72, 17 L. R. A. (N. S.) 364; *Richmond* v. *Carneal*, 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341.

Also we have said, and very recently repeated, that whenever a statute is enforced by the judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and free from all constitutional objections.

*Portsmouth* v. *Weiss*, 145 Va. 94, 133 S. E. 781; *Board of Supervisors* v. *State Milk Comm.*, ante, p. 1, 60 S. E. (2d) 35.

Under that part of the statute we are considering the sole criterion of the right to picket is whether the picketer is a *bona fide* employee of the business or industry being picketed. Like the statute in the *Thornhill Case* and the ordinance in the *Carlson Case*, it leaves no room for exception based upon the number of persons engaged in picketing, the peaceful character of the picketing, the nature of the dispute or controversy, or the truthfulness of what is said or written. It could be applied to make it a crime for any person not employed by a business or industry to publish, by word or sign, his opinion as to the morality, the decency or the danger of what is being done by or said within any business or industry; *e. g.*, to picket or participate in picketing the showing of a moving picture considered by the picketer to be corruptive of good morals. Illustrations could be multiplied.

In that respect the statute here, like that in the *Thornhill Case*, but unlike the injunctions sustained in the other cases referred to, does not aim specifically and exclusively at evils within the allowable area of State control, but includes in its broad sweep other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. As said of the statute in the *Thornhill Case*, it readily lends itself to harsh or discriminatory enforcement and "an accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him." 310 U. S. at p. 98, 60 S. Ct. at p. 742. See *Pennsylvania Labor Relations Board* v. *Chester & Delaware, etc., Employees Union*, 361 Pa. 246, 64 A. (2d) 834, 11 A. L. R. (2d) 1259, and Anno. at p. 1274.

■ For the reasons stated we hold that that part of section 3 of the act which makes it unlawful for any person

who is not a *bona fide* employee of the business or industry being picketed to participate in any picketing or any picketing activity with respect to such business or industry is invalid, and the conviction of these defendants thereunder cannot be sustained. No other part of the act is here in question and we express no opinion upon the validity of any other provision of the act.

The judgment of conviction is therefore reversed and the case dismissed.

*Reversed and dismissed.*