## LOCAL UNION NO. 10, UNITED ASSOCIATION OF JOURNEYMEN PLUMBERS & STEAMFITTERS, ET AL. *v.* GRAHAM ET AL., TRADING AS GRAHAM BROTHERS.

No. 86.   Argued December 8, 1952.—Decided March 16, 1953.

*Herbert S. Thatcher* argued the cause for petitioners. With him on the brief were *J. Albert Woll, James A. Glenn* and *John R. Foley.*

*Richmond Moore, Jr.* submitted on brief for respondents.

Mr. Justice Burton delivered the opinion of the Court.

The basic question here is whether the Commonwealth of Virginia, consistently with the Constitution of the United States, may enjoin peaceful picketing when it is carried on for purposes in conflict with the Virginia Right to Work Statute.[1]  A question also before us is whether the record in this case justifies the finding, made below, that the picketing was for such purposes. We answer each in the affirmative.

A bill of complaint was filed September 25, 1950, in the Law and Equity Court of the City of Richmond, Virginia, by respondents, doing a general contracting

---

[1] "1. Section 1. It is hereby declared to be the public policy of Virginia that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization.

"Section 2. Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against public policy and an illegal combination or conspiracy.

"Section 3. No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer.

"Section 4. No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment.

"Section 5. No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization.

"Section 6. Any person who may be denied employment or be deprived of continuation of his employment in violation of sections three, four or five or of one or more of such sections, shall be entitled to recover from such employer and from any other person, firm,

business there. They named as defendants Local Union No. 10, United Association of Journeymen Plumbers and Steamfitters of the United States and Canada of the American Federation of Labor, here called the Plumbers Union, three other local unions, the business agents of each of the unions and the Richmond Building & Construction Trades Council.[2] The complaint alleged in substance that respondents had begun work under their contract with the City of Richmond to build the George Washington Carver School, that early completion of the school was urgent, that respondents had made contracts with all necessary subcontractors, that some of the subcontractors employed only union labor while others employed nonunion as well as union labor, that in July certain of the defendants had requested that all nonunion labor on the project be laid off and had said that, unless

corporation or association acting in concert with him by appropriate action in the courts of this Commonwealth such damages as he may have sustained by reason of such denial or deprivation of employment.

"Section 7. The provisions of this act shall not apply to any lawful contract in force on the effective date hereof but they shall apply in all respects to contracts entered into thereafter and to any renewal or extension of an existing contract." Va. Acts, Extra Session 1947, c. 2, Va. Code, 1950, §§ 40–68 to 40–74, inclusive.

See also, recognition of such state legislation in the Taft-Hartley Act:

"SEC. 14. . . .

"(b) Nothing in this Act [National Labor Relations Act, as amended] shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." 61 Stat. 151, 29 U. S. C. (Supp. V) § 164 (b).

[2] The unions named were Local Union No. 1018, Brotherhood of Painters, Decorators and Paperhangers of America; Local Union No. 64, Cement Finishers and Operative Plasterers International Association; and Local Union No. 147, International Union of Operating Engineers, each affiliated with the American Federation of Labor.

that were done, "every effort would be made to prevent any union labor employed . . . on that project from continuing work thereon," that on September 25 certain of the defendants had picketed the project, carrying a sign reading "This Is Not a Union Job. Richmond Trades Council," that, as a result of such picketing, union members on the job had refused to continue to work there and that, therefore, the project had "slowed to a standstill." The complaint further alleged that the foregoing demands sought to induce respondents to take action which would subject them to criminal and civil liabilities under the Virginia Right to Work Statute and to break respondents' contracts with such of their subcontractors as did not employ all union labor. Finally, it alleged that the objectives of defendants in making such demands and conducting such picketing were to prevent nonunion employees from working on the project. On the strength of such allegations, the trial court granted respondents the temporary injunction they sought and the picketing ceased. A motion to dissolve the injunction was denied, an answer was filed, depositions were taken and the temporary injunction was continued in effect until July 17, 1951. On that date, the trial court made the injunction permanent. The court rendered no opinion but included the following statement in its decree:

> "[I]t appearing to the Court that the picketing complained of was conducted and carried on by the defendants, except for those defendants hereinafter noted, and *for aims, purposes and objectives in conflict with the provisions of the Right To Work laws of the State of Virginia and, therefore, illegal,* that a permanent injunction is necessary to prevent irreparable harm and damage to the complainants, and that complainants have already been damaged to the

extent of One Hundred and Ninety ($190.00) Dollars, the Court doth so find; . . . ." (Emphasis supplied.) [3]

January 23, 1952, the Supreme Court of Appeals of Virginia, also without opinion, refused to hear an appeal but said in its order "the court being of opinion that the said decrees [of the trial court] are plainly right, doth reject said petition and refuse said appeal and supersedeas, the effect of which is to affirm the decree of the said law and equity court." Because of the importance of the issue in the practical administration of labor law, we granted certiorari. 344 U. S. 811. Respondents filed no brief here other than that in opposition to the petition for certiorari and submitted their case without oral argument.

A few days before our grant of certiorari, the Supreme Court of Appeals of Virginia, in another case, reached a result which petitioners claim is in conflict with its judgment in the instant case. *Painters & Paperhangers Local Union No. 1018* v. *Rountree Corp.,* 194 Va. 148, 72 S. E. 2d 402. We find that decision helpful as upholding the constitutionality of the Right to Work Statute and interpreting its meaning, but we do not find it inconsistent with the result below. See also, *Edwards* v. *Virginia,* 191 Va. 272, 60 S. E. 2d 916; *Finney* v. *Hawkins,* 189 Va. 878, 54 S. E. 2d 872; *American Federation of Labor* v. *American Sash Co.,* 335 U. S. 538; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525.

---

[3] The decree dismissed the complaint against Local Union No. 147 and its business agent, but enjoined the remaining defendants "from interfering with, molesting or otherwise carrying on their picketing or other activities in front of or around the site of construction of George Washington Carver School in the City of Richmond, Virginia."

Petitioners now object to the breadth of the terms of the injunction. That objection was not presented in their petition for certiorari and is not considered here.

In the *Rountree* case, 194 Va., at 154, 72 S. E. 2d, at 405, the highest court of Virginia holds that the Statute does not prohibit peaceful picketing "unless . . . for an unlawful purpose." It adds that "a purpose to compel the complainants to discharge the non-union painters or to compel the painters to join the union as a condition of their continued employment" would be an unlawful purpose, but it fails to find the existence of such a purpose. On the other hand, in the instant case, the same court states that the injunctive decrees of the trial court "are plainly right." It thereby sustains the trial court's finding that "the picketing complained of was . . . carried on by the defendants . . . for aims, purposes and objectives in conflict with the provisions of the Right To Work laws of the State of Virginia . . . ." The *Rountree* case thus reflects an instance of picketing so conducted as not to be in violation of the Right to Work Statute, whereas the facts in the instant case reflect conduct that is in conflict with the provisions of that Statute. However innocent the picketing appeared while in progress, the Virginia courts found that it was combined with conduct and circumstances occurring before and during the picketing that demonstrated a purpose on the part of petitioners that was in conflict with the Right to Work Statute.

In a case of this kind, we are justified in searching the record to determine whether the crucial finding by the state courts had a reasonable basis in the evidence.[4] The record consists of the depositions of nine witnesses taken

---

[4] ". . . it is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality. That is why this Court has the ultimate power to search the records in the state courts where a claim of constitutionality is effectively made. . . .

". . . We have not only his [the master's] findings but his findings authenticated by the State of Illinois speaking through her supreme

six to nine months after the events described. There is some conflict in the testimony as to what took place July 27, 28, and September 25, 26. The record contains, however, ample grounds for sustaining the crucial findings of the trial court. Those grounds appear particularly in the testimony of respondent O. J. Graham and his general manager, J. Q. Acree, as to what was said during their conversation, on July 28, 1950, with J. F. Joinville, business agent of the Plumbers Union and president of the Richmond Building & Construction Trades Council, together with Henry Cochran, business agent of the Engineers Union and Secretary and Treasurer of the same Trades Council.[5]

---

court. We can reject such a determination only if we can say that it is so without warrant as to be a palpable evasion of the constitutional guarantee here invoked." *Drivers Union* v. *Meadowmoor Dairies*, 312 U. S. 287, 293, 294.

[5] For example, O. J. Graham testified:

"A. . . . he [Joinville] finally got into the question of this particular job at the George Washington Carver School and Mr. Joinville said he wanted us to make it one hundred per cent union job and I told him we couldn't do that, that we had already let sub-contracts that were union and non-union and we weren't making any distinction between the two, generally speaking, unless something was wrong or unless we didn't think the sub-contractor could perform like we wanted him to; that we let the contract to the lowest bidder, whether he was union or non-union, and Mr. Joinville then said about this plumbing and heating contract he wanted me to cancel the contract with Talley and I told him we couldn't do that, that a contract with a non-union man was just as valid as one with a union man, and that led on into a discussion of the general policy of the Richmond Trades Council.

"The way that came up was I asked Mr. Joinville why pick out this job, that a number of other contractors were operating the same as we were now and we had been very friendly with the unions, hadn't had any trouble with them and sometime past we had worked probably ninety per cent union on some jobs and our relations up to this time had been very good. 'Well,' he said, 'from now on, we are not going to permit the things we have been permitting in the past and

It is undisputed that the picketing lasted from 8 a. m., September 25, until stopped by injunction the following noon. The picketing was peaceful in appearance. There usually was but one picket and there never were more than two pickets on duty at a time. There was no violence and no use of abusive language. Each picket walked up and down the sidewalk adjoining the project carrying a sign bearing substantially the language quoted in the complaint. September 25, the picketing was done consecutively by the respective business agents of the Painters, Plumbers, Plasterers and Ironworkers unions. The premises picketed were frequented by few except the construction workers. The project was in its earliest stages. Before the picketing began, there were not more than fourteen men at work. Of these, three union carpenters worked about one hour on September 25. They left the project when the picketing began and returned a few days after the picketing stopped. Two union ironworkers or rodmen gave notice on the preceding Saturday that picketing was to begin Monday, September 25, and that, therefore, they would not come to work. They never returned and the contractor was delayed several days while seeking to replace them. A nonunion plumber was assisted by a helper, who, oddly enough, belonged to a

---

if a job isn't one hundred per cent union, the union labor is not going to work on it; it has got to be one hundred per cent union.' If it wasn't—talking about this particular job together with any other jobs in the future, not only of ours, but other people's as well, that they would just have to take what came from the union as a result of not being one hundred per cent union, and we did discuss to some degree the right-to-work law and the effect that it had had or should have on labor and I told him I didn't see how we could comply with the law and make any job one hundred per cent union. 'Well,' he said, 'nobody else is paying any attention to the right-to-work law; I don't see any reason why Graham Brothers should be so concerned about it.' "

printers union.   The plumber did not stop work but his helper left when the picketing began.

The others present were six or seven laborers whose status as union men was not clear.   They did not quit but the work on the project as a whole came to a substantial standstill during the week of September 25, because the principal activity then called for was that of pouring concrete which required the services of rodmen as well as those of laborers.

The effect of the picketing was confirmatory of its purpose as found by the trial court.   Petitioners here engaged in more than the mere publication of the fact that the job was not 100% union.   Their picketing was done at such a place and in such a manner that, coupled with established union policies and traditions, it caused the union men to stop work and thus slow the project to a general standstill.   Such conduct, furthermore, was conditioned upon the fact that some of the work on this job, particularly the plumbing, was being done by a subcontractor who employed nonunion labor, whereas Joinville had demanded of the general contractor that the job be "one hundred per cent union."

The policy of Virginia which is expressed in its Right to Work Statute is summarized as follows by its highest court:

> "It provides in substance that neither membership nor non-membership in a labor union shall be made a condition of employment; that a contract limiting employment to union members is against public policy; and that a person denied employment because he is either a member of a union or not a member of a union shall have a right of action for damages."   *Finney* v. *Hawkins,* 189 Va. 878, 880, 54 S. E. 2d 872, 874.

Based upon the findings of the trial court, we have a case in which picketing was undertaken and carried on with at least one of its substantial purposes in conflict with the declared policy of Virginia. The immediate results of the picketing demonstrated its potential effectiveness, unless enjoined, as a practical means of putting pressure on the general contractor to eliminate from further participation all nonunion men or all subcontractors employing nonunion men on the project.

Assuming the above conclusions to have been established, petitioners still contend that the injunction in this case was inconsistent with the Fourteenth Amendment to the Constitution of the United States. On the reasoning and authority of our recent decisions, we reaffirm our position to the contrary. *Building Service Union* v. *Gazzam,* 339 U. S. 532; *Teamsters Union* v. *Hanke,* 339 U. S. 470; *Hughes* v. *Superior Court,* 339 U. S. 460; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490; *Thomas* v. *Collins,* 323 U. S. 516, 537–538, and 543–544 (concurring opinion); *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 776–777 (concurring opinion); *Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722; *Carlson* v. *California,* 310 U. S. 106; *Thornhill* v. *Alabama,* 310 U. S. 88, 103–104; *Senn* v. *Tile Layers Union,* 301 U. S. 468, 479–481. See also, *Electrical Workers* v. *Labor Board,* 341 U. S. 694, 705.

The judgment of the Supreme Court of Appeals of Virginia accordingly is

*Affirmed.*

MR. JUSTICE BLACK dissents.

MR. JUSTICE DOUGLAS, dissenting.

If this union used the coercive power of picketing to force the contractor to discharge the nonunion men who

were employed on the job, Virginia could issue the injunction. For it is within the police power of the state to keep opportunities for work open to both nonunion and union men. See *Giboney* v. *Empire Storage Co.,* 336 U. S. 490; *Building Service Union* v. *Gazzam,* 339 U. S. 532. But if the union did no more than advertise to union men and union sympathizers that nonunion men were employed on the job, the picketing would be privileged.

Picketing is a form of free speech—the workingman's method of giving publicity to the facts of industrial life. As such it is entitled to constitutional protection. *Thornhill* v. *Alabama,* 310 U. S. 88. No court would be entitled to prevent the dissemination of the news "This is not a Union Job," whether it be by radio, by newspaper, by pamphlets, or by picketing. A picket carrying that sign would be proclaiming to all union men to stay away. Yet as MR. JUSTICE MINTON, dissenting in *Teamsters Union* v. *Hanke,* 339 U. S. 470, 481, 482, stated, peaceful picketing when used "as an instrument of publicity" is a form of speech protected by the First and Fourteenth Amendments. It is entitled to that protection though it incites to action. For it is the aim of most ideas to shape conduct.[1]

The line between permissible and unlawful picketing will therefore often be narrow or even tenuous. A purpose to deprive nonunion men of employment would make the picketing unlawful; a purpose to keep union men away from the job would give the picketing constitutional protection. The difficulty here is that we

---

[1] I have expressed elsewhere my views concerning the line between sanctity of speech and the unlawful use of the coercive power of unions. See *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 775–777; *Thomas* v. *Collins,* 323 U. S. 516, 543–544.

have no findings of fact. We have only the recitation in the decree that the picketing conflicted with the Virginia statute.

There is a dispute in the testimony as to the purpose of the picketing. The contractor testified that the aim was to coerce him to replace nonunion men with union men. The union official testified unequivocally that that was not the purpose, that the aim was to inform union men that nonunion men were on the job.[2] Per-

---

[2] Mr. Joinville testified:

"Q. Now Mr. Graham has alleged that you came to talk with him as business representative for Local No. 10 and that you renewed your request of July 27, 1950, that all non-union labor on the job project be laid off or discharged. Did you make that request?

"A. No.

"Q. Were you interested in all the non-union labor on the project being laid off?

"A. I was only interested in furthering the interests of union labor. As to the standing and who was on the job and what crafts, I didn't know and didn't know until I talked to Mr. Graham and got it from him direct.

"Q. Did you in your conversation with him request him to lay off or fire or discharge anybody?

"A. No. Mr. Graham definitely told me he intended to go through with it and I asked him to give his contracts to some of the boys— some of the contractors whom he had let his contracts to in the past. He said definitely he had made commitment to Mr. Talley and he intended to hold Mr. Talley to his commitment and see that Mr. Talley completed that job, and knowing the contracting business, I know that.

. . . . . .

"Q. You have testified that you went to see him [Mr. Graham] for the purpose of getting him to use some of your union subcontractors, is that correct?

"A. That is my job, to promote subcontractors and my membership wherever possible.

"Q. He refused to do just that, didn't he?

"A. He said he had already let the contract to a non-union,—as

haps the trial judge believed the contractor. Perhaps he deemed it irrelevant to resolve the conflict. Certainly I cannot resolve it from this cold record. I believe the case should be remanded for specific findings. We spoke in *Thornhill* v. *Alabama, supra,* at 105, of the importance of a "narrowly drawn" picketing statute, of the danger of one that condemned picketing indiscriminately. The same dangers are inherent in cases where there are no findings and yet where the unlawful purpose must be found before the picketing can be enjoined. If Virginia is to enjoin this form of free speech, I would require her to show precisely the reasons for it. Unless we are meticulous in that regard, great rights will be lost by the absence of findings, by the generality of findings, or by the vagueness of decrees. There is more than suspicion that that has happened here. For the decree permanently enjoins defendants from "carrying on their picketing or other activities in front of or around" the construction site. This decree was not "tailored to prevent a specific violation" of state law. *Building Service Union* v. *Gazzam,*

---

I assume, I had no relationship with him—to a contractor by the name of Talley and he had no intention of violating that contract with Talley, and I agreed with him.

"Q. Then he denied your men the right to work for him, didn't he?

"A. He definitely did.

. . . .

"Q. Mr. Joinville, did Mr. Graham refuse to employ any of your local union men?

"A. He definitely took the stand he wouldn't have anyone but Talley on that job.

"Q. Did you ask Mr. Graham to cancel his contract with Talley?

"A. No. I have been in this construction business long enough and business agent for twenty some years and I know when a contract is signed and delivered nobody cancels them.

"Q. That would have nothing to do with the State Law, would it?

"A. That is right."

*supra,* at 541.[3]   It is a broadside against all picketing, the kind of general assault condemned by *Thornhill* v. *Alabama, supra.* It illustrates the evil consequences that flow from a failure to be utterly painstaking in isolating the precise evils in picketing which the state may regulate.

---

[3] See also *Hughes* v. *Superior Court,* 339 U. S. 460, where we upheld the validity of an injunction which restrained the defendants from "picketing . . . for the purpose of compelling plaintiff to do any of the following acts:

"(1) the selective hiring of negro clerks, such hiring to be based on the proportion of white and negro customers who patronize plaintiff's stores; . . . ."

This purpose was declared unlawful by the California courts and we sustained the injunction *directed against that unlawful purpose.* Cf. *Hotel Employees' Local* v. *Wisconsin Board,* 315 U. S. 437, involving an administrative order prohibiting picketing. It was undisputed that the picketing had erupted into violence. We accepted the Wisconsin court's determination that the order was directed only against such unlawful conduct and did not reach out to strike down peaceful picketing for a lawful purpose.