Burke, J.
This appeal puts in issue once again the constitutionality of an application of this State’s motion picture licensing statute (Education Law, § 122). The Appellate Division has annulled a determination of the Board of Regents which directed the elimination of two scenes from the film ‘‘ A Stranger Knocks ” as a condition for granting a license for the exhibition of the film. The grounds for the board’s action rested on the alleged obscenity of two sequences in the picture. The first scene presents a man and a woman on a beach embracing and caressing one another, and ends in a view of the head and shoulders of the woman with facial expressions indicative of orgasmic reaction. The second scene presents the woman astride the man on a bed. Their bodily movements are unmistakably those of the sexual act and the woman’s face again registers emotions concededly indicative of orgasm. This scene is the dramatic climax of the picture because of the coincidence of the woman’s passion with her sudden realization, through the exposure of a tell-tale scar, that the man is her deceased husband’s murderer. As respondent’s affidavit puts it: “ The climax is a groan of pleasure and pain, a dramatic and eloquent expression of the persistent ambivalence in the relationship ”.
This case presents the question of film obscenity in a form quite different from the two decisions of this court that were reversed by the Supreme Court. In both Commercial Pictures Corp. v. Regents (346 U. S. 587, advocacy of adultery) and Joseph Burstyn, Inc., v. Wilson (343 U. S. 495, sacrilege) the issue was so-called thematic obscenity, that is, advocacy of a theme that was forbidden. Here, however, the ground taken by the State is obscenity in filmed behavior, not in anything advocated as an idea or program. We are, therefore, required to examine the applicability of the First Amendment to this film in light of the classic distinction between advocating something presently against the law and actually doing it.
The first thing that ought to be restated is the rather obvious fact that the law does not cope with obscenity in the abstract. It is met only as an alleged characteristic of something else, *91 something concrete, some speech, action or thing. Accordingly, it must not be forgotten that offensiveness and obscenity enjoy no preferred position in the law merely because of their being offensive. That would be nonsense. It is the thing alleged to be obscene that the Constitution is concerned with — and that only when the thing is speech, broadly conceived as communication. For example, the sale or display of some object condemned as obscene might present a question of statutory construction, rarely a First Amendment problem. Similarly, an offensive sight is on its face no more legally immune under the First Amendment than, for example, an offensive odor. This need not even approach the obscene. Zoning regulations controlling the appearance of buildings and the like are routinely enforced (e.g., Berman v. Parker, 348 U. S. 26; People v. Stover, 12 N Y 2d 462).
While typically applicable to “speech” and “press” in the forms known to the framers, the guarantee of the First Amendment has been read to include anything that is asserted to be someone’s way of saying something. The most familiar instances of this application are physical conduct and motion pictures (Thornhill v. Alabama, 310 U. S. 88; Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, supra). Cases involving conduct as a form of expression have been frequent in labor law and provide a useful illustration of the transition from a somewhat doctrinaire application of the First Amendment (see, e.g., Thornhill v. Alabama, 310 U. S. 88, supra) to a realization that, while conduct may be speech, it still remains conduct and does not cease to present its unique problems of social control. It is now the law that even peaceful picketing may be forbidden where it violates State labor laws that are not themselves designed as restrictions on freedom of speech (Plumbers Union v. Graham, 345 U. S. 192). Conduct that is proscribed for valid public purposes is not immune merely because engaged in with a view to expression (Giboney v. Empire Stor. Co., 336 U. S. 490). For example, in People v. Stover (12 N Y 2d 462, supra, opp. dsmd. for want of a substantial Federal question 375 U. S. 42) this court upheld an “Aesthetic” ordinance prohibiting the display of soiled laundry on a clothesline in the defendants’ front yard, despite the fact that the display was an expression of social protest.
*92 Films, by their nature, may lie on either side of the division between speech and conduct. The opinions of the Supreme Court reversing this court in the cases of advocacy of adultery and thematic sacrilege make that plain. But it also follows that if ‘ ‘ picketing may include conduct other than speech, conduct which can be made the subject of restrictive legislation ” (Giboney v. Empire Stor. Co. supra, p. 501) then so may films. In this regard, it will be noted that the Supreme Court has not yet expressed its opinion in a case involving allegedly obscene behavior on the screen. In such a case, the First Amendment must be applied to films according to their special nature, just as it has been applied to conduct. This much has, of course, been explicitly recognized in the leading case on films and the First Amendment: “Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems.” (Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, 503, supra.)
In Kingsley Pictures Corp. v. Regents (360 U. S. 684) the opinion of the court repeatedly distinguishes between the right to communicate any idea, however deviant from orthodoxy, and “ the manner of its portrayal” (p. 688). The “freedom to advocate ideas” was protected, not any supposed right to behave lewdly in a public place. Even more to the point is the concurring opinion of Mr. Justice Clark who wrote: “I see no grounds for confusion, however, were a statute to ban ‘ pornographic ’ films, or those that ‘ portray acts of sexual immorality, perversion or lewdness ’. If New York’s statute had been so construed by its highest court I believe it would have met the requirements of due process. Instead, it placed more emphasis on what the film teaches than what it depicts. There is where the confusion enters” (p. 702; emphasis in original).
It is my view that a filmed presentation of sexual intercourse, whether real or simulated, is just as subject to State prohibition as similar conduct if engaged in on the street. I believe the nature of films is sufficiently different from books to justify the conclusion that the critical difference between advocacy and actual performance of the forbidden act is reached when simulated sexual intercourse is portrayed on the screen. I take it to be conceded that New York may consti *93 tutionally prohibit sexual intercourse in public. As Mr. Justice Douglas acknowledged, dissenting in Roth v. United States (354 U. S. 476, 512), in contrasting books with conduct: “ I assume there is nothing in the Constitution which forbids Congress from using its power over the mails to proscribe conduct on the grounds of good morals. No one would suggest that the First Amendment permits nudity in public places, adultery, and other phases of sexual misconduct” (emphasis in text).
This observation is equally pertinent, of course, whether the sexual exhibitionism is done spontaneously in the street or in theatres for money (e.g., Penal Law, §§ 43, 1140, 1140-a, 1140-b). There have been many cases dealing with what sort of behavior was covered by statutes against sexual exhibitionism and the like, but they were solely concerned with statutory interpretation, never, obviously, the First Amendment. (Miller v. People, 5 Barb. 203; People v. Burke, 243 App. Div. 83, affd. 267 N. Y. 571; People v. Mitchell, 296 N. Y. 672; People v. Dash, 282 N. Y. 632.)
This comparison between the acknowledged competence of the State to forbid public or semipublic sex displays and its power to exert similar control over similar conduct depicted on the screen is not intended to imply any broad theory of legal equivalence between real conduct and a filmed imitation. Indeed, the meaningful comparison exists only in a narrow range of cases. In most instances, the real conduct is illegal because of what is accomplished by the person, as in murder, forgery, or adultery. In such cases, the filmed dramatization obviously does not share the evil aimed at in the law applicable to the real thing. Where, however, the real conduct is illegal, not because of what is accomplished by those involved, but simply because what is done is shocking, offensive to see, and generally believed destructive of the general level of morality, then a filmed simulation fully shares, it seems to me, the evil of the original. In such cases the free expression protection of the First Amendment must apply to both or neither. It makes no sense at all to say that the conduct can be forbidden but not the play or film.
The pattern of statutory regulation in New York aims at offensive—more properly, obscene — displays of conduct *94 whether in the street (Penal Law, §§ 43, 1140, 1140-b), on the stage (Penal Law, § 1140-a; People v. Vickers, 259 App. Div. 841 — lewd dance) or on the screen (Penal Law, §§ 1140-a, 1141; Education Law, § 122). These laws care not about the communication of ideas (see Stromberg v. California, 283 U. S. 359); they are aimed at certain narrow sorts of conduct. It seems to me, therefore, that if the defendants in People v. Stover (supra) could constitutionally be prohibited from selecting the forbidden form of conduct as the vehicle for the communication of their protest, then this petitioner cannot choose acted-out sexual intercourse as the vehicle for its art (see, also, People v. Vickers, supra, where a performer was prohibited from choosing a certain sort of dance as her vehicle, and the “ nude gymnasium ” prohibited by Penal Law, § 1140-b). Numerous other instances also suggest themselves.
If we can accept the obvious — that sexual intercourse whether performed in the park or simulated on the stage or screen is in itself a form of conduct (in which the public have an interest*), it is apparent that when this defendant chooses to use it as a vehicle for the expression of art it has “brigaded ” the communication (to the extent that it is “ communication ”) with conduct completely. In so doing the petitioner has subjected itself to such regulations as are appropriate to the *95 conduct when engaged in for reasons having nothing to do with expression. There is otherwise no difference between advocacy and action. (Compare Thornhill v. Alabama, 310 U. S. 88, with Plumbers Union v. Graham, 345 U. S. 192.) “Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it ” (Douglas, J., dissenting in Roth v. United States, 354 U. S. 476, 514).
Just what regulations are appropriate regarding displays of sexual intimacy in public or semipublic places may be a matter for debate. The debate is most profitably conducted, however, in the malleable forum of public policy rather than within the rigidities of constitutional law. In regard to conduct which has been legislatively declared to be against public policy, we are reminded by Mr. Justice Holmes that “ There is nothing that I more deprecate than the use of the Fourteenth Amendment beyond the absolute compulsion of its words to prevent the making of social experiments that an important part of the community desires, in the insulated chambers afforded by the several States, even though the experiments may seem futile or even noxious to me and to those whose judgment I most respect ” (dissenting opinion in Truax v. Corrigan, 257 U. S. 312, 344). The sole exception to this tolerance of experimentation is legislation hostile to that freedom of expression necessary to the healthy functioning of an open democratic society. It is after careful consideration that I conclude that, far from hostility to any idea, even hateful ideas that undermine social morality, section 122 of the Education Law merely proscribes certain behavior, which, when viewed by the public, is deemed offensive and destructive of moral standards historically protected by the State and which “ bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion ” (Schneider v. State, 308 U. S. 147,161).
The scenes referred to by the State are obscene within the meaning of section 122 of the Education Law as I understand it in light of the Fourteenth Amendment. The issue of obscenity as a constitutional standard applicable to speech proper, or whether the conduct here depicted can even be meaningfully thought of as speech in this context, need not be decided.
*96 Lastly, because the material assigned as obscene in this case is not, in my view, speech, as opposed to conduct, it need not come within the test laid down in Roth v. United States (354 U. S. 476, supra) that, in speech cases, obscenity must be the dominant theme of the work as a whole. If that requirement were applicable to cases of this nature, the law would be helpless to cope with the grossest imaginable pornography if it were included in a film as an incidental feature, collateral to the main plot, just as a profitable bit of sensationalism. If we admit of the concept of obscenity as a public evil at all, it must be recognized that the full force of such an evil could flourish in nonthematic interludes of motion pictures. If simulated sexual intercourse outrages public decency, it does so as such and not only when the sole or dominant subject of any given exhibition. The licensing statute contemplates the deletion of such material. It may either be omitted entirely or the producer may redo the scene another way. If it is objected that the enterprise is artistically not worth doing without the scene as it stands, that is the problem, not of the law, but of the producer who has made a pornographic scene so central to his work.
To all argument predicated on artistic merit as decisive of the constitutional question, it is sufficient answer to say that artists are not such favorites of the law that they may ply their craft in the teeth of a declared overriding public policy against pornographic displays. Since no either profession is privileged to bend public morals, policy and law to its internal craft standards, then neither should producers of films.
The order appealed from should be reversed and the determination of the Board of Regents reinstated, with costs in this court and in the Appellate Division.

The police or general powers of government extend to “the preservation of good order and the public morals.” (Beer Co. v. Massachusetts, 97 U. S. 25, 33.) As Hr. Justice Hablau recently stated the .State’s authority to legislate in support of moral standards: “Yet the very inclusion of the category of morality among state concerns indicates that society is not limited in its objects only to the physical well-being of the community, but has traditionally concerned itself with the moral soundness of its people as well. Indeed to attempt a line between public behavior and that which is purely consensual or solitary would be to withdraw from such community concern a range of subjects with which every society in civilized times has found it necessary to deal. The laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up, as well as laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis. Compare McGowan v. Maryland, 366 U. S. 420.” (Harlan, J., dissenting in Poe v. Ullman, 367 U. S. 497, 545-546.)