**CHAMBERS et al. v. IDEAL PURE MILK CO. et al.**

**CHAMBERS et al. v. ELMORE et al.**

Court of Appeals of Kentucky.
Jan. 25, 1952.

———◆———

Davis, Boehl, Viser & Marcus, Louisville, for appellants.

Wilson & Wilson, Owensboro, for appellees.

MILLIKEN, Justice.

About 3 o'clock in the morning of February 10, 1941, the appellees' horse drawn, lighted milk wagon moved northwardly along Center Street, Owensboro, and proceeded to turn left in a westerly direction into Fourth Street, which is U. S. 60, designated by city ordinance as an arterial highway. Before the left turn could be completed it was cut in two by a speeding automobile driven without lights by Wren

Shearer, who was fleeing from city policemen, the appellants, Robert Chambers and Jack Long, who were pursuing him in a city police cruiser. At the trial in October, 1949, eight years after the accident, the jury rendered a verdict for $588.83 for the appellee Ideal Pure Milk Company, for its property damage, and a verdict for $10,-588.85 for the driver, the appellee Milton (Si) Elmore, as compensation for his severe injuries. One of the grounds urged for reversal of the judgments is the contention that the pursuit of Shearer by the appellants, policemen, was not the proximate cause of the damage.

Mr. Elmore, the driver of the milk wagon, was unable to testify as to whose automobile hit him. On the other hand, the appellants, policemen, stated that their car did not hit the milk wagon, but that the severed portion of the milk wagon hit their car on the left rear fender. "We didn't hit it; we had already stopped when it (the severed portion of the milk wagon) hit the back end of our car." (Testimony of Robert Chambers.) This is indicated by photographs filed as Chambers' Exhibits No. 2 and No.4. Wren Shearer testified that he was going seventy to seventy-five miles an hour at the time of his collision with the milk wagon, and it was his opinion that the police cruiser caught up with him, hit his car, his car hit the milk wagon, and the police cruiser bounded around and hit the milk wagon too. However, he could not testify to this as a fact. Mr. Elmore, the driver of the milk wagon, had testified that he felt two almost simultaneous blows at the time of the collision.

Appellant Chambers testified by deposition that he saw the milk wagon come out of Center Street when the cruiser was about a block away, thought an accident might be impending at Fourth and Center, and that he managed to slow down sufficiently to turn right from Fourth Street south into Center Street. It was while making this turn that he says the severed portion of the milk wagon spun around and collided against the cruiser's left rear fender. If the cruiser had not come to a dead stop at the time of impact with the severed portion of the milk wagon, the skid marks ten to twenty feet in length shown in Chambers' photographic Exhibit No. 4, and admittedly the marks of the cruiser, show that it had almost done so. In fact, the skid marks reveal that the cruiser attempted to turn south into Center Street after having nearly crossed that thoroughfare. This clearly indicates that the driver of the cruiser was attempting to avoid the scene of the collision and to dodge the moving, severed portion of the milk wagon, which, nevertheless, hit his left rear fender.

Chambers said he was acquainted with Shearer's past record, that "he was a suspicious character and we have a right to investigate suspicious characters," and that was the reason in the beginning why he decided to turn his cruiser around in order to see what Shearer was doing in the parked car. The chase that followed covered about thirteen city blocks before the accident occurred, and during it the cruiser had its red lights flashing, its siren screaming, and the officers fired shots into the air in an effort to halt Shearer.

The statute regulating the speed of motor vehicles does not apply to city fire and police vehicles, now KRS 189.390(4a); Carroll's Kentucky Statutes, Section 2739g-51(9), effective at the time of this accident, and police cars have the right of way while being operated as such "with due regard to the safety of the public." KRS 189.-320; Carroll's Kentucky Statutes, Section 2739g-38. In the case at bar, the police officers turned to investigate an automobile parked on a dark street and occupied by a person whose bad reputation had become known to them. This certainly was within the scope of their duties and was also good police practice. The driver of the parked car attempted to avoid the investigation by driving away. When the police tried to catch up with him he drove faster, ultimately attaining seventy to seventy-five miles an hour at the time he crashed into the milk wagon. Certainly, such conduct on his part, though perhaps characteristic of the criminally minded, would not excuse the police from pursuing him. Charged as they were with the obligation to enforce the law, the traffic laws included, they would have been derelict in their duty had they not pursued him. The police were performing

their duty when Shearer, in gross violation of his duty to obey the speed laws, crashed into the milk wagon. To argue that the officers' pursuit caused Shearer to speed may be factually true, but it does not follow that the officers are liable at law for the results of Shearer's negligent speed. Police cannot be made insurers of the conduct of the culprits they chase. It is our conclusion that the action of the police was not the legal or proximate cause of the accident, and that the jury should have been instructed to find for the appellants.

■ The Maryland Casualty Company and the City of Owensboro were made parties defendant because of counsels' misinterpretation of KRS 95.820, which authorizes municipalities such as Owensboro to "provide public liability insurance for the regular police and fire departments and their personnel. * * * The insurance shall be for the indemnity of the *personnel* of the police and fire departments against any claims for damages resulting from the use of any motor vehicle or other equipment of the departments in any activity within the usual and normal prescribed duties or purposes of the departments. * * *" The City secured such a policy from the Maryland Casualty Company which covered the police officers involved in this case. While the City itself was immune from liability because of its defense of governmental function, the individual policemen had no such sweeping defense, 62 C.J.S., Municipal Corporations, § .575(b); Manwaring v. Geisler, 191 Ky. 532, 230 S.W. 918, 18 A.L.R. 192, so the statute authorized the expenditure of public funds to afford the police and firemen protection. The Casualty Company apparently refused to admit any liability in this case. On the theory that the aforesaid statute and the insurance bought as a result of its enactment authorized suits against the City for the torts of its employees, the City and Casualty Company were made parties defendant, thus opening the door to informing the jury that the police officers were insured.

Some support for this theory was found in Taylor v. Knox County Board of Education, 292 Ky. 767, 167 S.W.2d 700, 701, 145 A.L.R. 1333, where this court interpreted KRS 160.310 which authorized county school boards to procure "liability and indemnity insurance against the negligence of the drivers or operators of school buses owned or operated by the board." The Taylor opinion held that under the statute as worded the School Board could be sued and that it was proper to show that the School Board had such insurance, for otherwise there would have been no justification for suing the School Board at all since it too was protected by the defense of governmental function. Wallace v. Laurel County Board of Education, 287 Ky. 454, 153 S.W.2d 915.

■ But the wording of KRS 95.820 authorizes no such practice, for "the insurance shall be for the indemnity of the *personnel* of the police and fire departments against any claims for damages resulting from the use of any motor vehicle or other equipment of the departments in any activity within the usual and normal prescribed duties or purposes of the departments." This statute does not take this class of case out of the general rule declared in New York Indemnity Co. v. Ewen, 221 Ky. 114, 298 S.W.182, whereby it was established that a plaintiff may not join the insured and the insurer in an action for the insured's negligence. As a consequence, the Maryland Casualty Company was an improper party to this litigation. No action could be maintained on the policy of insurance until judgment had been obtained against the insured policemen.

In the event of another trial the City of Owensboro and the Maryland Casualty Company shall be dismissed as parties defendant, and the jury instructed to return verdicts for the defendant policemen in both actions in the event the evidence offered is substantially the same as that presented in this record.

The judgment in each case is reversed.