Joe Howard *et al. v.* James H. Haven *et al.*

(*Knoxville,* September Term (May Session) 1954.)

Opinion filed June 10, 1955.

Rehearing denied August 2, 1955.

H. G. B. KING, of Chattanooga, for petitioner.

H. M. HUMPHREYS and CHAMBLISS, CHAMBLISS & BROWN, all of Chattanooga, for respondent.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The complainants, Howard, Clark and Atchley, are engaged in business in Cleveland, Tennessee, under the name of City Electric Service. They filed their original bill in the Chancery Court against the defendants, James H. Haven, a resident of Bradley County, Tennessee, and

five other co-defendants, naming them, seeking an injunction to restrain them from interfering with the complainants in their right to perform a contract for the erection of a hospital in Cleveland, Tennessee.

The bill charges that the complainants had entered into a contract with L. A. Warlick Contracting Company whereby they engaged and bound themselves to execute and perform certain electrical work on said hospital. The alleged wrongful acts of the defendants are as follows:

"Complainants aver and charge that the International Brotherhood of Electrical Workers, Earl W. Burnette and Claude Harris as representatives of said Brotherhood and Local 175 thereof, have interfered with the contract which they have with L. A. Warlick Contracting Company, and have by threats, force, intimidation and pressure induced L. A. Warlick Contracting Company to exclude complainants from the hospital job and will continue to do so unless enjoined by an order of this Court. Complainants further aver that they have a contract, are entitled to do the work, and will suffer irreparable damages unless they are permitted to go ahead and complete and contract as they have engaged themselves to do but they are prevented therefrom by the wrongful action of defendants James H. Haven, the Cofer Electric Company, the International Brotherhood of Electrical Workers, Claude Harris and Earl W. Burnette."

The writ of injunction was issued upon fiat of the Chancellor. All defendants were served with process and answers were filed admitting certain charges in the bill and specifically denying others. The answers, however, put in issue the determinative issue as to whether or not the defendants brought about a breach of the contract

which the complainants claimed they had with the L. A. Warlick Company.

Following the introduction of evidence upon this issue the complainants dismissed their bill against the L. A. Warlick Company, due to the fact that other defendants, and particularly the Local Labor Union No. 175 of the International Brotherhood of Electrical Workers had threatened to black-list Warlick if the complainants were permitted to fulfill their contract in erecting the said Cleveland Hospital.

The prayer of the bill was for an injunction as aforesaid and for treble damages against the defendants.

The defendants' counsel moved the court to dismiss the bill as to one of the defendants, Cofer Electric Company, on the ground that it "charges or infers a conspiracy" and no overt act is charged, etc. Following the introduction of proof by the complainants, the defendants asked leave to withdraw their answer and file a plea in abatement, which the Chancellor denied. The case was in progress upon issues which had been submitted to a jury under the direction of the court when the request was made. Under proper instructions of the Chancellor the issues were the following:

(1) Did any of the following defendants unlawfully procure a breach of contract which City Electric had with Warlick:

(a) W. A. Cofer—Yes or No?

(b) Local 175—Yes or No?

(c) Earl W. Burnette—Yes or No?

(2) If your answer to either a, b, or c of Issue 1 is yes, what, if anything, is the amount of damages?

The jury answered the first issue as follows:

(a) W. A. Cofer—No.

(b) Local 175 of the International Brotherhood of Electrical Workers—Yes.

(c) Earl W. Burnette—No.

On Issue No. 2 as to the amount of damages, the jury assessed $7,330, or 10% of the bid. This judgment was approved by the Chancellor, who then entered judgment under Section 7811 of the Code for three times the amount, or the sum of $21,990.

The defendant moved the court for a new trial upon numerous grounds, which was overruled and an appeal granted to the Court of Appeals, which resulted in the affirmance of the Chancellor.

We granted certiorari and filed the following notation with the record:

"The petition for writ of certiorari is granted.

"Counsel will confine their argument upon the hearing to the question of whether or not this judgment is void on its face by reason of the fact that the verdict of the jury exonerated the agent through whom the local union was acting and there is no evidence that the principal acted otherwise than through said agent in the alleged conduct in bringing about a breach of this contract."

The foregoing proposition was orally discussed before the Court by counsel for both the petitioner and the respondent. Counsel was also permitted to discuss the testimony relating to the alleged conspiracy to deprive the complainants of their contract.

The factual issue as to whether or not Local 175 of the Electrical Workers procured a breach of the contract which complainants had with the Warlick Company is foreclosed by the concurrent finding of fact by the Chancellor and the Court of Appeals; and also the damages assessed by the jury.

The Court of Appeals in discussing this issue reached the following conclusion:

"It appears to us that the Local Union, through its Business Agent, threatened to put the contractor on the blacklist and thus threatened him of a general walkout of all his men, not only on the hospital contract but all other jobs which the contractor had, for only one purpose, to force the contractor to breach his contract with these complainants and to give this contract for the wiring of the Bradley County Memorial Hospital to W. A. Cofer or some other Union approved contractor.

"It thus appears that the coercive power of the Union was used to accomplish an act which has been declared illegal in Tennessee, both under the common law and the statutory law, to-wit, the procurement of a breach of contract. See Local Union No. 10, etc. v. Graham, 345 U. S. 192, 73 S. Ct. 585, 97 L. Ed. 946."

The counsel for the petitioner, Local No. 175, has argued with considerable force the issue that the judgment is inconsistent and illegal, contending that since Burnette as "business agent" was acquitted of any part in causing a breach of the contract his principal must likewise be absolved of any participation in the wrong. Counsel quotes at length excerpts from the testimony of witnesses to support his argument that Local 175 did not threaten Warlick, i. e. to "put him on the blacklist". The question is, who threatened to put him on the blacklist, was it Burnette, acting as agent for Local No. 175, or some other named defendant in the cause, or the Union acting upon its own initiative for the purpose of compelling Warlick to cancel the contract? Of course, the petitioner, Local 175, seeks to avoid liability upon

the theory that Burnette was charged with being the "business agent of the Union" and that since he was acquitted the entire case goes out for that reason.

When the case was argued orally before the Court the counsel for the respondents (complainants below) urged upon us that not only Burnette, as business agent for the Union, procured the breach of the contract but that Local 175 was a participant, and its action was established by undisputed facts and circumstances showing that all named defendants were jointly liable as conspirators in the transaction.

We think the Chancellor and Court of Appeals were justified in finding that Local No. 175 was an active participant; that others, who were identified with the Union, were taking part in the controversy, all of which resulted in a forcible breach of the contract. The petitioner, Local No. 175, being a voluntary association, couldn't act except through its membership. Its conduct could be, and was, shown by circumstances indicating that it was a joint conspirator along with other named defendants. If the Chancellor and Court of Appeals believed Warlick, and that his evidence and other corroborating circumstances convicted the petitioner, Local No. 175, the acquittal of Burnette as an active participant would not affect petitioner's liability. Williams was a representative of Local No. 175, as was Burnette. According to Warlick and Sara Ross both men voiced the threat of the Union to blacklist him, which would result in shutting down every job he had in Chattanooga and in Cleveland. When we consider what subsequently happened, and the facts and circumstances leading up to it, there is material evidence to show that complainants lost the contract because of the activity of Local No. 175,

Burnette, Williams, and Cofer, who took over the contract at a bid of $2,000 above the complainants' bid.

 It is not material that Williams was not sued as a joint wrongdoer, as well as other members of the Union; nor is it important that the jury should find against one defendant and in favor of another, since all joint wrongdoers are liable jointly and severally for all damages. Nor can the one against whom the judgment is rendered escape liability on the ground that others were acquitted. The record discloses the most convincing evidence of the fact that Local No. 175 was vitally interested in securing the Warlick contract for Chattanooga contractors who employed only Union workers. We think the weight of the evidence shows that Local 175 was the principal conspirator. Its members were the ultimate beneficiaries, regardless of any office they might hold in the union. Those who suffered as a direct result of the breach of the contract were Warlick who had to pay $2,000 above what he had contracted to pay respondents, and these respondents who lost $7,330.

There might be substance in the contention of petitioner that the acquittal of Burnette as its "business agent" operates to relieve it of liability, if the doctrine of *respondeat superior* were applicable. But it has no application in the case now before us. The authorities relied on by the petitioner's counsel to sustain the contention that in tort actions "a verdict in favor of the agent necessarily amounts to a finding that the principal is also not liable" apply in cases involving negligence by an agent which is imputable to his principal.

The counsel has recognized the fact from the beginning that petitioner and others were charged with conspiracy to breach the contract between Warlick and re-

spondents. The courts below concurred in finding that it existed in violation of Code Section 7811, which reads as follows:

"It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of said contract; and the party injured by such breach may bring his suit for said breach and for such damages."

We think it is immaterial whether the petitioner and its co-defendant acted pursuant to a conspiracy or to effect a common purpose and design. One or all who participated are liable for the wrongs and injuries resulting therefrom.

The case of *Loveman Co.* v. *Bayless,* 128 Tenn. 307, 160 S. W. 841, 842, can hardly apply to the case at bar. Bayless sued the D. B. Loveman Co. and two of its servants for damages for alleged false imprisonment, assault and battery, etc. The plaintiff invoked the doctrine of *respondeat superior* against the Loveman Co. There was a verdict against the Loveman Co. and in favor of the servants. In holding that the verdict was inconsistent and that the master was not liable, it was said:

"When the master is sued solely for misfeasance, or nonfeasance, on the part of his servants, being liable for their conduct only under the doctrine of *respondeat superior,* a verdict, permitted to stand in favor of such servants, either in an action where they are sued with the master, or in a prior action, entitles

the master to a discharge from such claimed liability.''

■ The foregoing rule, however, does not apply to the instant case for the reason that Local No. 175 of the Electrical Workers Union did not occupy the relationship of master to its co-defendants as servants. But liability is grounded on the charge, and proven facts, that there was a common purpose and design to cause a breach of contract by threats and intimidation to injure the respondents and the Warlick Construction Company. But aside from the question of alleged conspiracy to injure another's property, or his right to the fruits of a contract, many authorities hold that though a number may be joined as defendants in an action, a judgment may be had against one to the exclusion of others, dependent upon the nature of the act and consequent damage to the plaintiff. See 11 Am. Jur. (Conspiracy), Section 59, p. 588, and cases cited.

■ The doctrine of *respondeat superior* cannot be invoked to relieve the principal of responsibility for the acts of Earl Burnette solely upon the ground that he was its ''business agent''. The authorities are abundant and need no citation to the effect that both the agent and his principal are liable for the wrongful act of the former when committed within the scope of the agent's authority, or when ratified by the principal if the act is not within the scope of such authority.

■ Now it is hardly a matter of dispute that Burnette was the accredited agent of Local Union No. 175. We take judicial cognizance of the fact that, as its ''business agent'', his duties related to the making of contracts under which only members of his organization would have the exclusive right of employment. Who besides Burnette could speak or act for Local No. 175 in these

matters? His voice was that of his principal when he and Williams gave notice to Warlick that letters were ready to be posted to the effect that he was to be "blacklisted" if the contract in question was not canceled. We think it can be said without serious dispute that it was the business of the Union to make war upon every contractor who refused to employ its members; and they were so acting in the instant case. If Burnette, as "business agent", was acting unlawfully, or beyond the scope of his authority, then all were so acting. They were knowingly acting in violation of law to the injury of both Warlick and these respondents. Moreover Local Union No. 175 accepted the benefits resulting from the unlawful acts of Burnette in that Cofer Electric Company, who was a member, obtained the contract which had been awarded to the respondents.

Agency in its broadest sense "includes every relation in which one person acts for or represents another." *C. M. Keys Commission Co.* v. *Miller*, 59 Okl. 42, 157 P. 1029, 1030; 2 Words and Phrases, Agency, p. 717. In *Electric Light & Power Co.* v. *Bristol Gas, Electric Light, etc., Co.*, 99 Tenn. 371, 381, 42 S. W. 19, 21 there appears the postulate by Mr. Justice Caldwell, "What one does through another he does himself." We think it was within the province of the jury to find against both Burnette and Local No. 175. The verdict in favor of Burnette did not affect the verdict and judgment against his co-defendant.

The petitioner having sent out its agent, clothed with plenary powers, to represent it in a matter vital to its interest, and having accepted the fruits thereof must abide the consequences. *Stevens* v. *Ozburn*, 1 Tenn. Ch. App. 213, 225. It is understandable that the jury found in favor of the "business agent" and against his co-

defendant upon the ground that only the latter profited by his acts.

▪ ■ We think it is a settled rule of law that, "In order to constitute one a wrongdoer by ratification, the original act must have been done in his interest, or been intended to further some purpose of his own." Cooley on Torts, 4th Ed., Vol. 1, Section 76. Thus in the instant case we have Burnette acting as agent, and also as a member of Local No. 175, in the commission of an unlawful act to forward the purpose of the Union; the fruits of which were accepted by its members.

The assignments of error are overruled, and the judgment of the Court of Appeals and that of the Chancellor is affirmed.

## On Petition to Rehear

The petition to rehear in this case is a mere reargument of the determinative issues. The petition quotes the exact language of the statute, Code, Sec. 7811, and follows it with the contention that the opinion of the Court fails to take notice of the constitutional right of free speech; that it deprives the Union and the individual members thereof of their right of free speech. The petitioner's complainant in this regard is, as follows:

"And the wording of the decision of the State Supreme Court, in affirming the Lower Courts, makes it an actionable wrong with treble damages for anyone, who in the exercise of free speech as protected by the United States Constitution, First and Fourteenth Amendments, by any words, motion or action procures or induces the breach of a contract, the Statute being so broad and general, especially as applied to the case at bar, that the mere notice to an employer that the union's membership

will strike or refuse to work with non-union men if it procures or causes the breach of a contract by a contractor creates liability for the damage regardless of the admitted fact that the contractor would have been forced to breach his contract or abandon it regardless of any advance notice by the union if the union men would refuse to work with his non-union sub-contractor's employees.''

To the foregoing exception to the opinion of the Court, which is couched in respectful language, we cannot agree. The members of the Court respect in a high degree the rights of labor, both union and non-union. We take pride in observing our oath of office to uphold and defend the Constitution of the United States and the State of Tennessee. There is no denial in the opinion of the right of free speech, or any other constitutional right.

The right of the members of the union (Local 175) to refuse to work upon a contract with non-union workers is fully recognized, but in so doing there is no right to employ it as a means of consummating the union's unlawful purpose. We also recognize the right of union employees, as well as any and all other workers to quit work at any time, to strike, so long as it is conducted in a lawful and peaceable manner.

The statute in question is not directed against any labor union or group of individuals but to ''any person'', who ''by inducement, persuasion, misrepresentation, or *other means*'' procures the breach of a valid contract shall be liable to the injured party ''in treble the amount of damages resulting from or *incident* to the breach of said contract.'' (Emphasis supplied.)

We think that Local 175 caused a breach of the contract, as pointed out in the original opinion. This being true, the statute became mandatory, and our opinion

merely served to make it a living force. With due respect to counsel, we cannot recede from our conclusion.

It was never the intention of the Legislature that the courts should make nice and technical distinctions in any cause in order to favor individuals or groups and thus contribute to the emasculation of the statute.

Contention is made that ''There is not a scintilla of evidence in the record to support this finding, other than that one member, Earl W. Burnette, acted on behalf of the Local Union.'' The foregoing is a gratuitous statement and reargues the question that was fully covered in the original opinion.

It is true we failed to pass upon the question of mitigation of damages, there being no provision in the law authorizing any mitigation of the penalty imposed upon the wrongdoer. It would be contradictory of the manifest purpose of the statute. Moreover, it is a strange paradox that the defendant who has, in wilful violation of law, deprived the complainant of the fruits of his contract, should now claim the right to be exonerated at the hands of the very person he has defrauded.

The petition to rehear is denied.