Douglas NEVILL and Wife Louise Nevill, Individually, and as the Surviving Parents and Next of Kin of Connell D. Nevill, Deceased, Plaintiffs–Appellees,

v.

The CITY OF TULLAHOMA, Tennessee, a Municipal Corporation, Defendant–Appellant.

Supreme Court of Tennessee, at Nashville.

Aug. 8, 1988.

John M. McCord, Henry & McCord, Tullahoma, for plaintiffs-appellees.

Stephen M. Worsham, Rick L. Moore, Robertson, Worsham, Moore & Hedges, Tullahoma, for defendant-appellant.

## OPINION

FONES, Justice.

Connell D. Nevill, age 19, sustained fatal injuries as a passenger in a vehicle that was fleeing from Tullahoma Police officers at speeds approximating 100 mph when it struck a tree. This suit was brought by his parents against the City of Tullahoma and the two officers who were in the police car, David Burkhalter and William Smith.

This action was subject to the Tennessee Governmental Tort Liability Act and after a non-jury trial the trial judge awarded plaintiffs a recovery in the sum of $130,-628.22, reduced by $25,000 received by plaintiffs in settlement of their claim against Wayne Culpepper, the driver of the vehicle in which Nevill was riding. The police officers were dismissed and the net judgment of $105,628.22 against the City of Tullahoma was within its insurance policy limits. No issue is made with respect to the amount of that judgment.

The Court of Appeals affirmed and this Court granted the City of Tullahoma's Rule 11 Application.

The lower courts found that the police officers were negligent in commencing pursuit and in continuing the pursuit at the speeds and presumably for the time and distance involved. Both courts found that the officers violated T.C.A. § 55–8–108, the Emergency Vehicle Statute, although there is no dispute but that the officers displayed the audio and visual signals as required to qualify for the immunities of that statute. Both courts also found that the officers were guilty of negligence in that in making the decision to pursue Culpepper they violated a provision of the Policy and Procedures Manual of the Tullahoma Police Department, by failing to obtain permission to engage in the pursuit.

■ We find that the sole proximate cause of the accident and resulting death of plaintiff's decedent was the negligence of Wayne Culpepper, and reverse and dismiss this suit.

The tragedy occurred on Friday night 8 July 1983, at approximately 11:30 p.m. Earlier in the evening many youths had gathered at the Fun Tunnel, located at the Northgate Mall, between North Jackson and North Atlantic Streets in Tullahoma. The Fun Tunnel was described as a sort of game room with video machines, etc. One witness, Jimmy Childers, went to the Fun Tunnel with Jimmy Bickers and Wendy Shields, who had been Wayne Culpepper's girlfriend. Culpepper appeared and was described by Childers as unsteady with slurred speech. Eventually Childers expressed the opinion that Culpepper was intoxicated. Trouble broke out between Culpepper and Bickers at the instigation of Culpepper and they went outside to settle their differences. There Childers observed Connell Nevill. Nevill, who was somewhat in the center of things, first said, "Let them fight." When Childers said, "Let's break them up," Nevill assisted him in pulling Culpepper off of Bickers. One Steve Walker, described as six foot four, weighing two hundred thirty pounds, tossed Culpepper over his shoulder and carried him away from the combat zone.

Later, Childers observed Culpepper trying to let the air out of the tires on Bickers'

car. Childers and Nevill "escorted" Culpepper to his own car and Childers left the two of them standing by Culpepper's car. The next time Childers saw them, Culpepper was driving around the mall in circles, at a high rate of speed, weaving between parked cars with tires screaming. Childers estimated there were about forty people in the lot, many of them running for cover behind parked cars as Culpepper continued "cutting doughnuts" as other witnesses described it. Childers estimated that Culpepper circled four or five times.

Burkhalter was driving the police car with Smith as passenger. They were going south on North Jackson Street when they heard tires screaming and sliding. They entered the mall, observed the Culpepper vehicle "cutting doughnuts" and approached the Culpepper vehicle with blue lights on. Before they were close enough to the Culpepper vehicle to get its license number it headed for the north rear exit by Castner–Knott, turned left on North Atlantic and drove north at a high rate of speed.

Both officers testified that Culpepper almost came to a stop before entering North Atlantic Street, at which time the door on the passenger side of the vehicle opened, an arm was seen on the door handle and the door was closed. The officers realized, for the first time, that there was a passenger in the vehicle. The Court of Appeals found that plaintiff's decedent had "no reasonable opportunity to exit the car before it became too dangerous to attempt to do so." Our view of this case renders it unnecessary that we address the City's issues of assumption of the risk and contributory negligence of the decedent based upon knowledge of Culpepper's intoxication.

The Court of Appeals' opinion accurately summarized the material evidence about the events of the pursuit as follows:

Certain distances along the route of the pursuit have been stipulated as follows:

From exit of parking lot

| | |
|---|---|
| to John Harton drive | .05 mi. |
| to Marbury Road | .25 mi. |
| to Silver Railroad box | .25 mi. |
| to Flowertown Rd. | .35 mi. |
| to Drive at Patty Solomon's field of vision | .10 mi. |

From exit of parking lot

| | |
|---|---|
| to Tullahoma City Limits | .55 mi. |
| to accident scene | .45 mi. |

The officers testified that they pursued at high speed from the parking lot exit to the Silver Box (a distance of .55 mi.) and that shortly after passing the box, the siren was deactivated, speed was reduced and the Culpepper vehicle disappeared "over the hill"; that they proceeded at reduced speed and slowed down to turn into Flowertown Road, but decided to continue on Atlanta Road where the Culpepper vehicle was found 1.45 miles beyond the Silver Box. There is no measurement from the place where the Culpepper vehicle disappeared from sight, but this was evidently between the Silver Box and Flowertown Road, so that, under the testimony of the officers, the Culpepper vehicle proceeded without visible pursuit for at least 1.1 mi. after visual contact was lost.

Randy Solomon testified that he was standing with Patty Solomon on a hill overlooking Flowertown Road and Atlantic Avenue and saw the Culpepper car "with the police car right behind it" come over the hill at Flowertown Road at high speed and descend into a "flattened straight-a-way" at 75 to 80 miles per hour with the police car 2½ or 3 car lengths behind the Culpepper car. From this testimony, the police were closely pursuing as far as Patty Solomon's field of vision at a point 1 mile from the beginning and .9 mile from the point of the fatal crash.

Mr. and Mrs. Arthur McBee testified that they were travelling on Atlantic Avenue beyond Flowertown Road when they saw headlights approaching from the rear at high speed, that they slowed down, the lead vehicle passed at 80 to 100 miles per hour, and 30 to 45 seconds later the police car passed at about 45 miles per hour, then accelerated and disappeared around a curve. This testimony would indicate that the police car was pursuing beyond Flowertown Road at a reduced speed until it passed the McBee's and accelerated.

The Court of Appeals then addressed the issue of proximate cause as follows:

> The actual time or distance between abandonment of pursuit and crash of the pursued is not of conclusive significance, but are circumstances bearing upon proximate cause, that is, the issue of whether the pursuit had a real causal connection with the fatal crash. It is well known that "the wicked flee when no man pursueth". It is readily deducible that if a suspect is fleeing at high speed to escape a pursuing police car, the suspect will not necessarily reduce speed after disappearing from sight over a hill or around a curve, but will continue at high speed until his escape is assured. In [*Fiser*] *Fizer v. City of Ann Arbor*, [417 Mich. 461, 339 N.W.2d 413 (1983)], the pursued was several miles from the pursuer, yet a recovery was held to be allowable.

This is the first time in the history of Tennessee jurisprudence that this Court has been confronted with the issues involved in a tort action seeking to impose liability on police officers for the decision to pursue law violators as well as for the manner of pursuit.

A number of our sister states have addressed these issues and the better reasoned opinions, as well as the numerical majority, hold contrary to the cases relied upon by the Court of Appeals.

In *Chambers v. Ideal Pure Milk Co.*, 245 S.W.2d 589 (Ky.1952) police engaged the law violator in a chase covering thirteen city blocks at speeds of approximately 75 miles an hour. The law violator's vehicle crashed into the plaintiff's vehicle and the plaintiff sued for his personal injuries. In rejecting liability, the Kentucky court stated as follows:

> Charged as they were with the obligation to enforce the law, the traffic laws included, they [the police] would have been derelict in their duty had they not pursued him. The police were performing their duty when Shearer, in gross violation of his duty to obey the speed laws, crashed into the milk wagon. To argue that the officers' pursuit caused Shearer to speed may be factually true, but it does not follow that the officers are liable at law for the results of Shearer's negligent speed. Police cannot be made insurers of the conduct of the culprits they chase. It is our conclusion that the action of the police was not the legal or proximate cause of the accident....

*Id.* at 590–91.

In *Wrubel v. State of New York*, 11 Misc.2d 878, 174 N.Y.S.2d 687 (Ct.Cl.1958), a state trooper who had observed a vehicle speeding gave chase with siren and flashing lights. The trooper was able to pull alongside the fleeing law violator several times and signaled him to pull over, but he continued speeding. Later, in negotiating a curve with the state trooper still in pursuit, the culprit struck an oncoming car, injuring plaintiff and his wife, who was a passenger in plaintiff's vehicle. The court held that the sole proximate cause of the accident was the action of the speeding law violator, with these interesting comments:

> Claimants' predication of liability on the State is founded on the novel position that the trooper, in attempting to halt one increasing the danger on the highway, did by his attempt alone increase the danger himself. To extend this position to the ultimate would require a police officer to pursue, at an otherwise lawful rate of speed, a law-breaker traveling at an unlawful rate of speed, or to ignore him in the first place.

> An operator who is speeding, or who is a reckless driver on the highway, would know that all he had to do was go faster —and under claimants' theory escape would be possible—there would be no chase. A burglar, bank robber or any other felon could threaten to shoot and under claimants' theory escape would be possible and arrest avoided. It is fantastic to further expand claimants' theory— such thinking would place a police officer in the same category as the Marquis of Queensbury in a pier six brawl.

*Id.*, 11 Misc.2d 878, 174 N.Y.S.2d at 689.

In *Roll v. Timberman*, 94 N.J.Super. 530, 229 A.2d 281 (1967) the Superior Court of New Jersey, Appellate Division, had before it a suit against a police officer, the

law violator he was pursuing, named Timberman, and the municipality. The plaintiff and his wife were injured when Timberman, fleeing from Officer Martin, attempted to pass a pick-up truck and collided head-on with plaintiff's vehicle, killing plaintiff's wife. The New Jersey court agreed with the reasoning of *Chambers* and *Wrubel* and other cases reaching similar results, emphasizing that it was the duty of a police officer who observed reckless driving to apprehend those whose recklessness makes the use of the highways dangerous to others, and that "the proximate cause of such an accident is the reckless driving of the pursued, notwithstanding recognition of the fact that the police pursuit contributed to the pursued's reckless driving." *Id.*, 229 A.2d at 284.

In *City of Miami v. Horne*, 198 So.2d 10 (Fla.1967), Officer Weaver had stopped one Anderson for speeding. He was writing tickets for speeding and for driving without a license when Anderson departed the scene at a high rate of speed. Weaver pursued Anderson with his red light and siren on at a high rate of speed through the northwest section of Miami. In response to Weaver's call, another officer joined in the pursuit. During the chase Anderson's vehicle reached speeds of 95 miles per hour, and at an intersection he struck a car driven by plaintiff's wife causing her instant death.

The trial court in *Horne* granted Miami's summary judgment motion but the intermediate appellate court reversed and remanded the case for a jury trial on the merits. In reversing the intermediate court and affirming the trial court's dismissal of plaintiff's suit, the Supreme Court of Florida reasoned as follows:

> If, by his complaint, the plaintiff charges the officer with reckless conduct simply because he pursued the offender, on the theory that mere pursuit creates a highway danger, we must disagree. Neither would we agree that while the officers should pursue offenders he must do so at lawful rates of speed or, in this case, at thirty miles per hour while the offender moved off at ninety miles per hour. We think the rule is that the officers should

> take such steps as may be necessary to apprehend the offender but, in doing so, not exceed proper and rational bounds nor act in a negligent, careless or wanton manner.

> In determining whether an officer, in pursuit, has acted negligently or recklessly it is to be borne in mind that he is charged with the duty of arresting the offender and must often exceed the precautions normally imposed upon individuals.

> . . . .

> The rule governing the conduct of police in pursuit of an escaping offender is that he must operate his car with due care and, in doing so, he is not responsible for the acts of the offender. Although pursuit may contribute to the reckless driving of the pursued, the officer is not obliged to allow him to escape.

> Finding no record evidence of lack of due care in the operation of appellant's police vehicle, we hold the decision of the trial judge correctly disposed of the cause.

*Id.* at 12–14.

Although the *Horne* opinion is not a model of clarity, it apparently would only impose liability upon a police officer and a municipality where the manner in which the pursuit was conducted evinced a degree of negligence higher than simple negligence. Similar results were reached in *Brechtel v. Lopez*, 140 So.2d 189 (La.App. 1962).

In *Dewald v. State*, 719 P.2d 643 (Wyo. 1986), two police cars pursued a swerving vehicle through downtown Laramie at speeds up to 55 miles an hour. After several blocks the officers backed off, but the fleeing law violator collided with a car stopped at a red light, killing the driver of that vehicle. The Court denied recovery holding as follows:

> [W]hen a police officer pursues a fleeing violator and the violator injures a third party as a result of the chase, the officer's pursuit is not the proximate cause of those injuries unless the circumstances indicate extreme or outrageous con-

duct by the officer. To put it another way, the possibility that the violator will injure a third party is too remote to create liability until the conduct of the officer becomes extreme.

*Id.* at 650.

The two principal cases relied upon by the Court of Appeals were *Mason v. Bitton*, 85 Wash.2d 321, 534 P.2d 1360 (1975) and *Fiser v. City of Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413 (1983).

In *Mason* both Washington State and Seattle police were involved in a chase on the interstate that reached speeds up to 140 miles per hour. The police abandoned the chase before the accident occurred. Eventually the offender crossed the median strip and hit the vehicle of plaintiff's decedent. Washington has a statute similar to the Tennessee Emergency Vehicle Statute and both the state patrol and the Seattle Police Department had issued internal policy statements to the general effect that there may be times when it would be "prudent" to cease pursuit at high speeds. The trial court granted summary judgment for the defendants, but the Supreme Court of Washington reversed and remanded for trial on the issue of whether the conduct of the officers was negligent in light of the state statute and internal police policies.

Under the facts in *Mason*, the only proximate negligence of which the officers could be guilty was the decision to undertake pursuit at all as there was no evidence of any negligence in the manner in which the pursuit was carried out. That parallels the fact situation in the instant case. It follows that in finding that a jury issue existed under that state of facts, the Court embraced the notion that the mere decision to pursue the law violator *ipso facto* increases the danger on the roadway and that the decision, rather than the manner of pursuit, provides a basis for a finding of proximate negligence. That non-contact theory of tort liability is predicated entirely on the speculation to-wit: that if the police had not elected to pursue, the law violator would not have caused the collision that injured plaintiff.

Our research discloses that most of the jurisdictions that find a jury issue pursuant to statutes similar to T.C.A. § 55–8–108 focus only on the *manner* of pursuit. The Missouri statute permits a police vehicle to exceed the speed limit, "so long as [it] does not endanger life or property," but it does not carry the additional standard of conduct found in the Tennessee statute, "nor shall such provisions protect the driver [of an authorized emergency vehicle] from the consequences of his *reckless disregard for the safety of others.*" *See* Mo.Ann.Stat. § 304.022 (Vernon 1972).

In *Oberkramer v. City of Ellisville*, 650 S.W.2d 286 (Mo.App.1983), the court specified factors that should be considered in determining whether the manner of pursuit by officers was negligent, after finding that exceeding the speed limit, in and of itself, was not a breach of the duty of care owed by officers pursuing law violators.

By enacting § 304.022, our legislature has made a policy judgment that the risk of injury inherent in high speed pursuits will be tolerated in the interests of promoting law and order. This tolerance, however, is limited. A heightened risk of injury is acceptable only so long as it does not become unreasonable—only so long as the utility of the conduct continues to outweigh the magnitude of the risk. A pursuit can become negligent if the utility of the conduct drops, where a policeman realizes the chase has become futile and nevertheless continues the chase, *Mason v. Bitton*, [citation omitted], or where the circumstances raise the magnitude of the risk beyond acceptable levels; for example, the chase continues into an area which the officers knew or should have known is highly congested with both pedestrian and vehicular traffic because of a shift change in a local factory....

*Id.* 650 S.W.2d at 292–93. However, the Missouri Court of Appeals reversed the trial court's dismissal of plaintiffs' suit and remanded in order to give plaintiffs an opportunity to file an amended petition. The Supreme Court of Missouri granted defendant's appeal, reversed the Court of Appeals and affirmed the trial court's dis-

missal of the suit. *Oberkramer v. City of Ellisville,* 706 S.W.2d 440 (Mo.1986). The holding of the Missouri court of last resort was consistent with the above quoted material from the Court of Appeals. They disagreed with and reversed the intermediate court only because the latter court granted plaintiffs a third opportunity to amend the complaint.

In disposing of the case the Supreme Court of Missouri said:

The view that a police officer is not liable for damages caused by a vehicle being pursued by the officer in the performance of his duties comports with decisions of most jurisdictions.

. . . .

The proximate cause of the accident was not the manner in which Officer Franey drove his police vehicle but rather the manner in which the pursued traffic violator drove his vehicle. Officer Franey was not careless or reckless and he acted as a prudent police officer performing his duty in an emergency situation. Therefore, this Court finds that plaintiffs failed to make a submissible case and that the trial court did not err in dismissing the petition.

*Id.* at 442.

In *Fiser v. City of Ann Arbor, supra,* the factors to consider in determining the reasonableness of a pursuing officer's conduct were described as follows:

. . . speed of pursuit, the area of pursuit, weather and road conditions, the presence of pedestrians and other traffic, the presence or absence of audible and visible warnings and the reason the officers were pursuing the fleeing vehicle.

*Id.,* 339 N.W.2d at 417.

Another panel of the Tennessee Court of Appeals, Middle Section, had this issue before it in December 1983. In an unpublished opinion authored by Judge Ben Cantrell, that court rejected the rationale of *Mason v. Bitton, supra,* embraced by the Court of Appeals in the instant case, and adopted the holding of *Reed v. City of Winter Park,* 253 So.2d 475 (Fla.App.1971), quoting as follows from that decision:

. . . that in pursuit of an escaping offender, a police officer who operates his vehicle with due care (in light of the standard by which his conduct should be judged) is not responsible for the acts of the pursued offender, although the pursuit may have contributed to the reckless driving of the pursued since the officer is not obliged to allow him to escape.

*Id.* at 477.

■ That panel of the Court of Appeals justified its holding with the following rationale:

The duty of police officers is to enforce the law and to make arrests in proper case, not to allow one being pursued to escape because of the fear that the flight may take a course that is dangerous to the public at large.

The opposite would, we think, be an unnecessary restriction on the ability of police officers to carry out their duties. In every case where a police officer sought to stop a motorist for a traffic violation, it would become a jury question whether the act of the officer was the proximate cause of any harm the motorist might cause in trying to avoid arrest. In our judgment any police officer would hesitate to make an arrest involving a moving automobile within or close to a city for fear that the subject being arrested would flee and cause harm to others for which the officer might be held responsible.

■ We agree with Judge Cantrell. In addition, we would expressly reject unequivocally the use of internal municipal police policy as establishing negligence per se when violated. Washington is the only jurisdiction that has given such promulgations equal status with state statutes and municipal ordinances, so far as our research reveals. One of the early cases in Tennessee discussing and approving the rule that where a state statute imposes a duty or prohibits an act for the benefit of a person or the public, the violation thereof constitutes negligence per se was *Queen v. Dayton Coal & Iron Co.,* 95 Tenn. 458 (1895). In *Memphis Street Railway v. Haynes,* 112 Tenn. 712 (1904), this Court

held, for the first time in a published opinion, that violation of a city ordinance would impose the same liability as the violation of a state statute. The rationale of the Court in *Haynes* was as follows:

> If an ordinance be passed for the protection of the individuals composing the public, as distinguished from the municipality itself, and be within the legislative power of the corporation, and any member of the public suffer an injury peculiar to himself by reason of the violation of such ordinance by some other person, it is difficult to see why, on any sound theory, he may not have an action therefor against the offender. Such ordinances are devised for the purpose of creating rules of conduct for the guidance of the people, just as statutes are, and they may be said to emanate ultimately from the legislature, since municipalities, in this State, at least, can exercise no powers which are not expressly or by implication conferred upon them by that body.

*Id.* at 722.

Police department policies are not enacted by duly elected representatives of the people. Also, there are numerous reasons for the promulgation of inner-departmental police policy that have nothing to do with the public's safety. For those reasons we hold it inappropriate to consider a violation of internal police department policies and procedures as constituting negligence or negligence per se. Factually, neither Burkhalter nor Smith were advised of the existence of the part of the Tullahoma Police Department Police and Procedures Manual relating to pursuit of law-breakers, until after the Culpepper accident.

■ In 1986, the Tennessee Legislature amended T.C.A. § 55–8–108 wherein a single standard of care applicable to law enforcement personnel pursuing an actual or suspected violator of the law was expressly provided. Public Acts 1986, chapter 822. The accident involved in the instant case occurred on 8 July 1983. The Emergency Vehicle Statute in effect at that time provided three different standards of conduct for officers pursuing actual or suspected violators of the law, using the prescribed audible visual signals, to-wit: (1) so long as he does not endanger life or property; (2) drives with due regard for the safety of others; and (3) a reckless disregard for the safety of others.

We hold that in the circumstances of the instant case the police officers did not violate any of these standards of care as a matter of law, and that the sole proximate cause of the accident was the negligence of Culpepper. More than twenty photographs and a video tape were introduced of the entire two mile route from the mall to the scene of the accident where Culpepper left the roadway on a curve and struck a tree. Most of that distance was a straight two lane road that became rural almost immediately after leaving the mall, paralleling a railroad track with few, if any, intersections other than "T" intersections. The episode occurred after 11:00 p.m. at night and there is no evidence that the manner of pursuit endangered any other vehicle or pedestrian. The notion that the decision to pursue lawbreakers is a negligent act that becomes a proximate cause of injury inflicted by a negligent lawbreaker because it is well known that, "the wicked flee—" has insignificant support in our sister states and we reject it in Tennessee.

The judgment of the Court of Appeals is reversed and this lawsuit is dismissed. Costs are adjudged against plaintiff.

HARBISON, C.J., and COOPER, and O'BRIEN, JJ., concur.

DROWOTA, J., dissents, see separate opinion.

DROWOTA, Justice, dissenting.

I respectfully dissent. The majority opinion holds that the sole proximate cause of the accident and resulting death of Connell Nevill was the negligence of Wayne Culpepper. The trial court and Court of Appeals have held that the death of Plaintiffs' decedent was proximately caused by the joint and concurring negligence of the Defendant and Wayne Culpepper. Issues of negligence and proximate cause are factual questions and our review of such ques-

tions, when we have concurrent findings of fact, is limited.

### Our Standard of Review

Our review of findings of fact is set out in T.C.A. § 27-1-113, "[t]o the extent that the findings of the chancery court and the Court of Appeals concur, they shall, if there be any evidence to support them, be conclusive upon any review of the facts in the Supreme Court." As Justice Tomlinson stated in *Hoover Motor Exp. Co., Inc. v. Clements Paper Co.*, 193 Tenn. 6, 9, 241 S.W.2d 851, 852 (1951), "if there is any material evidence to sustain the concurrent finding of fact then the Supreme Court is bound thereby not only as to that finding but as well to an inference or conclusion reasonably drawn from the evidence that it is a fact." In *Howard v. Haven*, 198 Tenn. 572, 577, 281 S.W.2d 480, 482 (1955), Chief Justice Neil stated that factual issues on which the trial court and Court of Appeals made concurrent findings were foreclosed for further review by the Supreme Court. See, *Arnold v. Hayslett*, 655 S.W.2d 941, 947 (Tenn.1983). Thus, our review of the factual issues involved in this case is limited, if not foreclosed.

### The Proceedings Below

The trial court, sitting without a jury, found: (1) that the police officers were negligent; (2) that their negligence was a proximate cause of the death of Plaintiffs' decedent; and (3) that Plaintiffs' decedent did not assume the risk and was not contributorily negligent. The trial court entered judgment against the Defendant, City of Tullahoma, in "the amount of $92,000.00 as the pecuniary value of the life of the deceased together with funeral expenses in the amount of $2,659.38 and medical expenses in the amount of $35,968.84 for a total judgment in the amount of $130,-628.22." As pointed out in the majority opinion, this judgment was reduced by $25,-000.00, which represented the policy limits of Culpepper and which was paid in settlement to Plaintiffs, leaving a judgment of $105,628.22 against the City of Tullahoma.

The Court of Appeals affirmed, holding that the violations of T.C.A. § 55-8-108 and the written policy and regulation of the Tullahoma Police Department that "[n]o officer will pursuit [sic] a car unless ordered by the supervisor or supervisor gives permission," were appropriate bases for the findings of negligence on the part of the pursuing officers; that such negligence was a proximate cause of the injury and death; and that the evidence did not preponderate against the trial court's finding that the Defendants failed to carry the burden of proof that the decedent assumed the risk or was contributorily negligent in bringing about his own death.

### The Facts

The City of Tullahoma had adopted, prior to the accident in this case, a formal, written policy pertaining to traffic pursuits and had published this policy in the "Tullahoma Police Department Policy and Procedures Manual" effective April 23, 1983. The pertinent portions provide as follows:

> "Upon receiving a call or starting a pursuit, *with supervisor's consent,* the officer shall write down the exact time, and the license number of the violator's car. *No officer will pursuit* [sic] *a car unless ordered by the supervisor or supervisor gives permission.*" (emphasis added.)

The police chief testified that this policy was formulated and published because "all high speed chases are dangerous and especially in town where the traffic is." He stated that the ends that might be obtained by the arrest of misdemeanor traffic violators do not justify the dangers involved; it was, therefore, the policy of the Tullahoma Police Department for its officers not to engage in high speed pursuit of traffic offenders "unless with the supervisor's permission."

The record reflects that on the night of July 8, 1983, Wayne Culpepper had been drinking and he and Jimmy Bickers got into a fight in the parking lot of Northgate Mall Shopping Center in Tullahoma. Connell Nevill and Culpepper were total strangers. Nevill "had not previously known [Culpepper] until the night of the

fatal accident." Nevill assisted in intervening and attempting to separate Culpepper and Bickers and to stop the fight between them. Nevill was talking to Culpepper and trying to calm him down, and, in an effort to do so, he got into the car with Culpepper. Suddenly and without prior warning, Culpepper "started his car and began driving around the parking lot in circles at a fairly high rate of speed without lights." As the Court of Appeals found, Plaintiffs' son had no "reasonable opportunity to exit the car before it became too dangerous to attempt to do so."

About a minute elapsed before police officers on routine patrol noticed the Culpepper vehicle. When the police officers entered the shopping center parking lot with flashing blue warning lights, the Culpepper vehicle departed the parking lot onto a public street at a high rate of speed. It was at this time that the passenger door swung open and the officers saw an individual reach out and slam the door. This was the first time either officer realized there was a passenger in the car. The officers followed Culpepper, also at a high rate of speed, with siren sounding and blue lights flashing. It was at this time that the officers initiated their first radio transmission stating, "I am attempting to stop a vehicle headed North on North Atlantic Street ... traveling at a high rate of speed." When the officers were approximately ½ mile from the Mall, Captain Holloway, the police officers' supervisor, radioed "wanting to know how fast the vehicle was going," and he was told "in excess of 100 miles an hour" and that "I [the pursuing officer] was doing 80 miles an hour, and I could not even get close to the vehicle." Captain Holloway "radioed back" and said "back off" (meaning to reduce speed) but "to continue forward in case they had wrecked." During the conversation with Captain Holloway, the police officers were still pursuing at a speed of "80 miles an hour" with siren on and the blue lights flashing. The officers stated that when their supervisor radioed to "back off" the driver of the police car let off the gas pedal, applied the brakes, and slowed to "about 40 miles an hour," and "turned the siren off" but never turned off the flashing blue lights. As the officers proceeded down North Atlantic Street (Normandy Road), they discovered the wrecked Culpepper vehicle about "five feet or so" off the roadway, and they immediately requested an ambulance. Connell Nevill sustained fatal injuries in the wreck.

I am of the opinion that the record supports Plaintiffs' contention that the written policy and regulation of the Tullahoma Police Department was violated in that no supervisor ordered pursuit; in fact the pursuit was initiated and conducted without the permission of the supervisor. When the supervisor ordered the officers to "back off," the evidence is conflicting on what action the officers took. As the Court of Appeals points out, "the testimony of details of the movement of the police [car] is controverted." Not only was the movement and speed of the police car sharply controverted, but also the use of the siren. The officers' testimony as to their speed and their distance from the Culpepper vehicle was contradicted by several witnesses. Two witnesses testified that the officers' active pursuit had not terminated where the officers said it had.

The Court of Appeals, in citing and discussing T.C.A. § 55–8–108, stated that the statute permits emergency vehicles to exceed the speed limit without violating the law; however, it does not confer immunity from tort liability for negligence, particularly in view of the wording of section 108(b)(3) "so long as he does not endanger life or property." Section 108(d) sets out the standard of care required of the driver of an authorized emergency vehicle as "the duty to drive with due regard for the safety of all persons" under the existing circumstances. The duty owed under the statute extends to "all persons" including passengers in fleeing cars.

Plaintiffs contend, and two courts have held, that the violation of the policy and regulation of the Tullahoma Police Department constitutes negligence.[1] Defendant

---

1. For a discussion of the admissibility of a city's    safety rules and regulations in actions involving

avers that the officers substantially complied with the policy and regulation; however, this is a question of fact. The issues of negligence, assumption of the risk, contributory negligence, and proximate cause, are all factual questions decided by the trial court and Court of Appeals in favor of the Plaintiffs.

Under our standard of review when we have concurrent findings of fact by the trial court and Court of Appeals, those facts are conclusive in this Court. I would, therefore, hold that the City and its police officers were negligent in the way and manner in which they initiated and conducted a high speed pursuit of a traffic offender in violation of the policy and operating procedures of the Tullahoma Police Department and in violation of T.C.A. § 55-8-108. I would further hold that the death of Plaintiffs' decedent was proximately caused by the joint and concurring negligence of the City of Tullahoma Police Officers, acting within the scope of their employment, and the negligent conduct of Third-Party Defendant, Wayne Culpepper. As found by the trial court and Court of Appeals, the intervening negligence of Third-Party Defendant was not the sole proximate cause of the accident and death of Connell Nevill. Finally, I would hold that the evidence does not sustain the affirmative defenses of assumption of risk and contributory negligence so as to bar recovery by Plaintiffs-Appellees. I have not discussed the numerous cases cited in the majority opinion because this case comes to this Court in a different factual posture. I would accordingly affirm the judgment of the trial court and Court of Appeals.

the allegedly negligent operation of a city vehicle, see 82 A.L.R.3d 1285, Safety Rules of

Municipal Corporation.